# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-50325

United States Court of Appeals
Fifth Circuit

**FILED**

August 2, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff – Appellee

v.

SAMUEL VELASCO GURROLA,

      Defendant – Appellant.

Appeal from the United States District Court
for the Western District of Texas

Before DAVIS, HAYNES, and DUNCAN, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge.

Defendant–appellant Samuel Velasco Gurrola ("Gurrola"), the leader of the Velasco Gurrola Criminal Enterprise (the "VCE"), appeals his conviction and sentence for three counts of conspiracy to kill in a foreign country and four counts of conspiracy to cause travel in foreign commerce in the commission of murder-for-hire. Finding no reversible error, we AFFIRM.[1]

---

[1] Because of the number of individuals involved in the events underlying this appeal, we include, for ease of reference, a table that lists those individuals and provides a short description of their role:

| | |
|---|---|
| Samuel Velasco Gurrola | ("Gurrola"), the sole defendant and leader of the VCE. |
| Emmanuel Velasco Gurrola | ("Emmanuel"), Gurrola's brother and the co-leader of the VCE. |

No. 17-50325

## I. FACTUAL AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to the verdict, the relevant facts are as follows: Gurrola formed the VCE in the early 2000's with his brother Emmanuel Velasco Gurrola ("Emmanuel"), his sister Dalia Valencia, aka Dalia Velasco ("Dalia"), and several other individuals. For a number of years, the VCE, spearheaded by Gurrola, engaged in racketeering, kidnapping, carjacking, and drug trafficking throughout the United States and northern Mexico.

In February 2004, Gurrola married Ruth Sagredo Escobedo ("Ruth"). A few months later, Ruth's five-year-old daughter from a previous marriage, A.A., informed Ruth that Gurrola had sexually assaulted her. Ruth subsequently took steps to have criminal charges filed against Gurrola in

| Dalia Valencia Velasco | ("Dalia"), Gurrola's sister and a role player in the murder conspiracy. |
| --- | --- |
| Ruth Sagredo Escobedo | ("Ruth"), Gurrola's ex-wife and the mother of A.A. who was murdered while riding in her sister's funeral procession. |
| A.A. | Ruth's daughter who Gurrola allegedly assaulted. |
| Cinthia Sagredo | ("Cinthia"), Ruth's sister who was murdered while working at the Sagredo family hotel. |
| Roberto Martinez | Roberto Martinez ("Roberto"), Ruth's boyfriend who was murdered while riding in a car with Ruth during Cinthia's funeral procession. |
| Francisco Villareal | ("Francisco"), Ruth's father who was murdered when his home was invaded. |
| Carlos Sagredo | ("Carlos"), Ruth's brother who witnessed Ruth's murder. |
| Alan Garcia | ("Alan"), the VCE member hired to kill Ruth and her family. |
| Arturo Garcia | ("Arturo"), Alan's father, a small-time criminal within the VCE, and a key government witness. |
| Cesar Silva | ("Cesar"), a low-level VCE member who primarily engaged in kidnappings, also a government witness. |
| Silvia Mendez | ("Mendez"), Gurrola's other ex-wife and a victim of a kidnapping that occurred just days after Ruth's murder. |
| Edgardo Avalos | ("Avalos"), A.A.'s father and Ruth's first husband. |
| Penny Hamilton | ("Hamilton"), the state court prosecutor during the investigation into the sexual assault of A.A. |

2

No. 17-50325

Texas state court. The State filed charges against Gurrola in 2005, but Gurrola's trial counsel obtained a number of continuances over the next three and a half years. Eventually though, the court drew a hard line: it reset the case for trial on November 12, 2008, and it told the parties that there would be no more continuances.

The State then notified Gurrola that Ruth was going to testify as the "outcry" witness,[2] which meant Ruth would be able to testify about A.A.'s out-of-court statements to Ruth describing the incident with Gurrola. As trial drew near, Gurrola began searching for a way to prevent Ruth from testifying. At a May 2008 pre-trial hearing, Gurrola approached Ruth and told her, in front of her family, that she would pay dearly if she did not drop the case. Gurrola then pointed to Ruth's father, Francisco Villareal ("Francisco"), and stated that he "would start with him." Despite this warning, Ruth aggressively urged the prosecutor to get the case to trial.

In September 2008, Gurrola met with Emmanuel, Dalia, Alan Garcia ("Alan"), and Arturo Garcia ("Arturo") at Dalia's residence in El Paso. At that meeting, Gurrola contrived a careful plan to have Ruth murdered in her hometown of Juarez, Mexico.[3] This presented a problem for Gurrola because Ruth did not travel to Juarez often, and Gurrola faced a rapidly approaching trial date on the sexual assault charge. Gurrola decided that Ruth would have to be lured to Juarez. Gurrola then hired Alan to murder Ruth's father,

---

[2] Under Texas law, an "outcry witness" is the first adult person other than the defendant to whom the child-complainant made a statement describing the incident. TEX. CODE CRIM. PROC. § 38.072.

[3] Gurrola wanted Ruth killed in Juarez because he did not want to draw the ire of American law enforcement.

No. 17-50325

Francisco, at his home in Juarez so that Ruth would have to travel to Juarez for the funeral.

On October 3, 2008, a group of masked individuals invaded Francisco's home, murdered him execution-style, and stole approximately $140,000 from his safe. As Gurrola had anticipated, Ruth returned home for Francisco's funeral. Coincidentally, that funeral occurred at the same time as the funeral of a Mexican law enforcement officer, which attracted a large law enforcement presence near Francisco's funeral. For this reason, the plan to murder Ruth could not be carried out.

Despite her father's murder, Ruth did not ask the State to drop the charges against Gurrola. However, as the November 12, 2008 trial date approached, Gurrola's counsel pleaded for one final continuance because Gurrola was allegedly gravely ill and unable to stand trial. The state court reluctantly granted the continuance and set a final trial date for December 9, 2008.

In the meantime, another plan congealed to lure Ruth to Juarez. On November 20, 2008, Cinthia Sagredo ("Cinthia"), Ruth's sister, was ambushed and murdered while working at the Sagredo family hotel in Juarez. As anticipated, Ruth attended Cinthia's funeral two days later. As Ruth and her boyfriend, Roberto Martinez ("Roberto"), drove in Cinthia's funeral procession, they were ambushed and brutally murdered. On December 9, 2008, Gurrola appeared ready to begin trial on the sexual assault charge. Deprived of its key witness, however, the State moved for a continuance and ultimately dismissed the case.

After a lengthy investigation into the murders of Ruth, Francisco, Cinthia, and Roberto, as well as the VCE's other illegal operations, on September 22, 2015, federal warrants were issued for several VCE members, including Gurrola. He was arrested the next day in El Paso and later charged

in a seven-count First Superseding Indictment for three counts of conspiracy to kill in a foreign country under 18 U.S.C. § 956(a) and four counts of conspiracy to cause travel in foreign commerce in the commission of murder-for-hire under 18 U.S.C. § 1958(a).

At the week-long trial, the Government produced nearly twenty witnesses, but none more important than Arturo Garcia. Arturo testified extensively to conversations he both participated in and overheard in which Gurrola, Alan, and others devised a plan to kill Ruth and her family. Arturo further testified that, after Ruth's murder, Gurrola admitted to the murders. This testimony was buttressed by extensive circumstantial evidence. Ultimately, a jury found Gurrola guilty on all seven counts.

The district court sentenced Gurrola to consecutive life sentences on counts one through four and concurrent life sentences on counts five through seven. The district court then ordered restitution, but it reserved determination of the final amount for a later date. On August 11, 2017, the district court entered a second amended judgment reflecting the final amount of restitution as $1,550,247.15. Gurrola timely appealed all seven convictions and sentences, including the final restitution award.

## II.  DISCUSSION

On appeal, Gurrola asserts that the district court committed several errors in both his trial and sentencing. We address each argument in turn.

### A. The voir dire

Gurrola's first claim of trial error is that the district court's restricted voir dire violated his Sixth Amendment right to a fair and impartial jury. The district court conducted the first part of voir dire by asking the venire a number of questions (his own questions and some questions submitted by both Gurrola and the Government prior to trial); the court then gave counsel for both sides five minutes for further questioning. At the expiration of Gurrola's allotted

No. 17-50325

time, Gurrola's request for additional time was denied. Gurrola's main argument is that the restricted voir dire did not enable him to adequately determine whether perspective jurors would be biased against him because of the allegations against him in the state court criminal proceeding.

This Court defers to the judgment of the district court regarding the time and scope of voir dire absent an abuse of discretion.[4] A district court does not abuse its discretion so long as the procedure used "created a reasonable assurance that prejudice would be discovered if present."[5]

Here, the district court questioned the veniremembers regarding their ability to follow the law as instructed and their impartiality concerning issues that typically arise in a criminal trial. Though the district court did not ask any questions specifically regarding the sexual assault allegations, the venire learned of those allegations when the court read the Government's statement of the case without objection at the outset of voir dire. Several veniremembers, in response to questions from the court on various topics, admitted in open court that they could not be impartial after learning of Gurrola's alleged sexual assault of Ruth's minor child. Those veniremembers were excused without further questioning, and none of the remaining veniremembers indicated that they harbored bias or prejudice against Gurrola based on the sexual assault allegations. Moreover, as part of the court's voir dire, it invited counsel for both sides to submit questions for the court to ask the venire. Although Gurrola submitted questions, none of them touched the sexual assault issue. Then, during the time allotted to Gurrola's counsel to question the venire, he raised a number of issues involving impartiality, but he asked no questions regarding the sexual assault allegations.

---

[4] *See United States v. Rodriguez*, 993 F.2d 1170, 1176 (5th Cir. 1993).
[5] *United States v. Harper*, 527 F.3d 396, 409 (5th Cir. 2008).

No. 17-50325

We have carefully reviewed the court's voir dire procedure and are satisfied that it was conducted to "create[ ] a reasonable assurance that prejudice would be discovered if present."[6] We thus find no error and conclude that Gurrola's argument that his Sixth Amendment rights were violated during voir dire is without merit.

## B. The district court's evidentiary rulings on hearsay objections

Gurrola next argues that the district court erred by allowing the Government to introduce inadmissible hearsay evidence. Gurrola's primary challenges relate to testimony about his statements to Arturo Garcia concerning Ruth's murder, Alan's statements to and interactions with Arturo following Francisco's murder, Ruth's statements to various individuals preceding her murder, and Emmanuel's statement to Cesar Silva ("Cesar") regarding Francisco's murder and robbery.

Because Gurrola objected to the admissibility of this testimony at trial, we review "for abuse of discretion, subject to the harmless error standard."[7] "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[8]

---

[6] *Id.* Gurrola also briefly argues that his right to a fair and impartial jury was violated by the Government's explanation of the reasonable doubt standard during its portion of voir dire. Because Gurrola did not object to this portion of the Government's voir dire at trial, we review this issue for plain error only and find none. *See United States v. Puckett*, 505 F.3d 377, 384 (5th Cir. 2007) (noting that plain-error review applies to forfeited errors). The district court instructed the jury on the proper meaning of "beyond a reasonable doubt," and, consequently, mitigated whatever possible inaccuracies were included in the Government's explanation. *See United States v. Garcia*, 86 F.3d 394, 401–02 (5th Cir. 1996).

[7] *United States v. Valas*, 822 F.3d 228, 239–40 (5th Cir. 2016).

[8] *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008).

No. 17-50325

### 1. *Gurrola's statements to Arturo*

At trial, Arturo testified to a number of highly incriminating statements allegedly made by Gurrola.[9] Gurrola argues that this testimony was inadmissible under the co-conspirator rule, Federal Rule of Evidence 801(d)(2)(E), on the ground that Arturo was not a member of the murder conspiracy at the relevant times. As the Government correctly maintains, regardless of their admissibility under the co-conspirator rule, Gurrola's own statements were admissible under Rule 801(d)(2)(A), which allows the introduction of statements "offered against an opposing party" that were "made by the party in an individual or representative capacity."[10] Therefore, the district court properly admitted Arturo's testimony.

### 2. *Arturo's testimony about the events following Francisco's murder*

Gurrola also claims that the district court erred by allowing Arturo to testify regarding a shoebox full of cash Alan stole from Francisco's home and certain events following Francisco's death because Arturo was not a co-conspirator of the murder conspiracy at that time. Gurrola's argument misses the mark.

Rule 801(d)(2)(E) only applies to *statements* made by a co-conspirator. At trial, the court allowed Arturo to testify to his personal knowledge of the events he observed following Francisco's death—but not statements that Alan

---

[9] Arturo testified that Gurrola, among other things, (1) told him that he (Gurrola) needed someone to kill his wife because she wanted to put him in jail for assaulting her four-year old daughter, (2) hatched a plan to kill Ruth at Dalia's house wherein he told Alan that he could find a safe filled with money at Ruth's father's house that would constitute partial payment for the murders and that, regardless of whether there was money in the safe, Gurrola would compensate Alan by funneling lucrative kidnapping opportunities toward Alan, and (3) on a separate occasion, admitted that he hired Alan to commit the murders and that Francisco and Cinthia were killed in order to lure Ruth into Mexico.

[10] FED. R. EVID. 801(d)(2)(A); *see also United States v. Franklin*, 586 F.2d 560, 568–69 (5th Cir. 1978); *United States v. Hutchins*, 818 F.2d 322, 328 (5th Cir. 1987).

allegedly made. For example, Arturo testified without objection that, at Alan's behest, Arturo traveled to Juarez to help transport money from Francisco's safe into the United States. He also testified without objection that Alan had a shoebox full of money in his possession when Arturo first arrived in Juarez the day after Francisco's murder.  However, when the Government asked Arturo to repeat several of Alan's precise statements, the district court sustained Gurrola's objection. Because the district court did not allow Arturo to testify to *statements* made by Alan, the hearsay rules were not implicated, and the district court did not abuse its discretion in admitting this evidence.

### 3.  *Ruth's statements*

Next, Gurrola argues that the district court erred by admitting several of Ruth's statements through the testimony of her brother, Carlos Sagredo ("Carlos"). Gurrola contends that the Government did not meet its burden to show that Gurrola actually created Ruth's unavailability as required by Federal Rule of Evidence 804(b)(6), and that, in any event, Ruth's statements should have been excluded under Federal Rule of Evidence 403.

Rule 804(b)(6), the forfeiture by wrongdoing exception, allows the introduction of statements offered against a party that has "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."[11] In order for the declarant's statements to be admissible, the wrongdoer must "ha[ve] in mind the particular purpose of making the witness unavailable."[12] The party offering this evidence must make this showing by a preponderance of the evidence.[13]

---

[11] *Giles v. Calif.*, 554 U.S. 353, 367 (2008) (quoting FED. R. EVID. 894(b)(6)).

[12] *Id.* (quoting 5 C. Mueller & L. Kirkpatrick, Federal Evidence § 8:134, p. 235 (3d ed. 2007)).

[13] *See United Stated v. Nelson*, 242 F. App'x 164, 170–71 (5th Cir. 2007). Although unpublished opinions are not precedential, they are persuasive. *See Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006).

No. 17-50325

The district court conducted a pre-trial hearing on the admissibility of Ruth's statements.[14] At the hearing, the case agent, Homeland Security Agent Thomas Salloway ("Agent Salloway"), testified that, during the course of his investigation, both Arturo Garcia and Cesar Silva informed him that they heard Gurrola say that Gurrola ordered Ruth murdered specifically to prevent her from testifying. Agent Salloway's testimony was highly probative of Gurrola's motive for having Ruth killed, and it was later confirmed by Arturo at trial. The district court was entitled to rely on Agent Salloway's testimony in rendering its pre-trial ruling and, consequently, it did not abuse its discretion by admitting Carlos's testimony under Rule 804(b)(6).[15]

Gurrola's Rule 403 argument is likewise unpersuasive.[16] Carlos testified that Ruth told him "[s]he was afraid, because she was being followed" and that she "was receiving threatening phone calls." He further testified that Ruth told him Gurrola approached her after a court hearing and warned her to "drop the case or it will cost you" while pointing at Francisco. Though this evidence was prejudicial, it was highly probative of Gurrola's motive and plan, especially considering Francisco was the first murder victim. Thus, the district court did not abuse its discretion in overruling the Rule 403 objection.

### 4. Emmanuel's statements to Cesar

Lastly, Gurrola argues that the district court erred by admitting portions of Cesar Silva's hearsay testimony in violation of his rights under the Confrontation Clause of the Sixth Amendment. Gurrola primarily takes issue

---

[14] District courts are "not bound by evidence rules, except those on privilege" when determining the admissibility of evidence at a pre-trial hearing. FED. R. EVID. 104(a).

[15] *See id.*

[16] Rule 403 provides that a court "*may* exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

10

with Cesar's testimony that Emmanuel told Cesar about "a supposed kidnapping" where members of the VCE invaded a home in Juarez, killed an older Hispanic person, and stole money from a safe—a description that neatly fit the circumstances of Francisco's murder. Gurrola contends that admission of this testimony violated his rights under the Confrontation Clause because Emmanuel was not available to be cross-examined. The Government counters that Emmanuel's statement falls within the co-conspirator exemption from hearsay, Rule 801(d)(2)(E), and, therefore, was not subject to the Confrontation Clause.[17]

The admissibility of Cesar's testimony depends on whether Emmanuel's statement falls under Rule 801(d)(2)(E).[18] To satisfy that rule, the proponent of a statement must show by a preponderance of the evidence that (1) a conspiracy existed, (2) the statement was made by a co-conspirator of the opposing party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy.[19]

The only element at issue here is whether Emmanuel's statement was made "in furtherance of" the murder conspiracy. The "in furtherance of" element "is not to be construed too strictly lest the purpose of the exception be defeated."[20] However, to pass muster, a statement must advance the ultimate objects of the conspiracy—"mere idle chatter" will not suffice.[21]

---

[17] The Confrontation Clause does not bear on non-testimonial statements. *See Davis v. Washington*, 547 U.S. 813, 821–22 (2006). And it is well-settled within this Circuit that co-conspirator statements are non-testimonial. *See, e.g.*, *United States v. Holmes*, 406 F.3d 337, 347–48 (5th Cir. 2005).

[18] We review a Confrontation Clause challenge de novo, subject to harmless error analysis. *United States v. Duron-Caldera*, 737 F.3d 988, 992 (5th Cir. 2013).

[19] *See United States v. Broussard*, 80 F.3d 1025, 1038 (5th Cir. 1996) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

[20] *United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999).

[21] *Id.*

On the one hand, Gurrola argues that Emmanuel's statement had nothing to do with the murders and that it was merely an effort to recruit Cesar into a wholly separate kidnapping conspiracy. The Government, on the other hand, argues that while one purpose of Emmanuel's statement was to convince Cesar to assist in kidnapping operations, its main purpose was to help Gurrola compensate Alan for murdering Ruth and her family. In support, the Government points to the murder-for-hire compensation agreement between Gurrola and Alan. Arturo testified at trial that Gurrola agreed to funnel lucrative kidnapping opportunities to Alan, and to assist Alan in those kidnappings, as additional compensation to Alan for his role as the assassin. We find no abuse of discretion in the admission of this evidence, especially considering that Emmanuel made this statement shortly after the murders occurred and, at that time, Gurrola presumably would have been trying to make good on his promise to Alan.

## C. The district court's admission of other acts evidence

In Gurrola's third claim of trial error, he challenges the admission of various crimes, wrongs, and other acts, including evidence of: the sexual assault of A.A.; Silvia Mendez's ("Mendez") kidnapping; rental vehicle usage in the VCE's kidnapping operations; and the death of Alan Garcia. All of this evidence, Gurrola contends, was minimally relevant, unduly prejudicial, and offered only to prove Gurrola acted in accordance with his bad character. The Government counters that the challenged evidence was intrinsic to the murders and also highly relevant to Gurrola's motive, preparation, and method.

Because Gurrola objected to the admission of this evidence at trial, we review "for abuse of discretion, subject to the harmless error standard."[22]

---

[22] *Valas*, 822 F.3d at 239–40.

Evidence of crimes, wrongs, and other bad acts is generally admissible if "intrinsic" to the crimes charged.[23] Evidence is considered intrinsic "if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of the trial."[24]

Gurrola's first argument relates to the alleged sexual assault of A.A. Gurrola contends that the prosecutor in the state criminal proceeding, Penny Hamilton ("Hamilton"), should not have been allowed to testify about her investigation of Gurrola, the indictment in that case, and the potential punishment Gurrola faced if convicted.[25] Gurrola's argument fails. This testimony was inextricably intertwined with the murder conspiracy. It established the timeline of events leading up to the murders, and it allowed the jury to "evaluate all of the circumstances under which [Gurrola] acted."[26] Therefore, it was properly admitted as intrinsic evidence.

The testimony concerning Mendez's kidnapping was also properly admitted as intrinsic evidence.[27] As stated above, Arturo Garcia testified that Gurrola offered to pay Alan for murdering Ruth, in part, by funneling Alan lucrative kidnapping opportunities. Mendez's kidnapping occurred just fourteen days after Ruth's murder, involved a significant ransom, and was linked, at least circumstantially, to Alan and Gurrola. Evidence related to this

---

[23] *See United States v. Sudeen*, 434 F.3d 384, 389 (5th Cir. 2005).

[24] *United States v. Morgan*, 117 F.3d 849, 861 (5th Cir. 1997).

[25] Gurrola also argues that Edgardo Avalos, A.A.'s father and Ruth's ex-husband, should not have been allowed to testify regarding circumstances surrounding the sexual assault case. Avalos merely testified that Ruth was vigorous in her pursuit of justice. This testimony, to the extent that it was not intrinsic, was highly probative of Gurrola's motive to have Ruth killed, and we cannot say that the district court abused its broad discretion in admitting it.

[26] *United States v. Randall*, 887 F.2d 1262, 1268 (5th Cir. 1989).

[27] *See United States v. Watkins*, 591 F.3d 780, 786 (5th Cir. 2009).

kidnapping thus served to complete the story of the murders because it supported the Government's theory that Gurrola held up his end of the bargain in the murder-for-hire scheme. Though a separate kidnapping may ordinarily constitute an "other bad act[ ]," here, due to the temporal proximity of the kidnapping and the unique context of the murder-for-hire agreement, the Mendez kidnapping is more accurately described as an "additional fact[ ] surrounding the charge at issue," which is intrinsic and admissible.[28]

However, the testimony and documentary evidence relating to rental car usage in other kidnappings and the testimony regarding Alan Garcia's death was extrinsic. To determine whether extrinsic act evidence was properly admitted, we conduct a two-step inquiry mandated by Federal Rule of Evidence 404(b).[29] "First it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of rule 403."[30] Our duty "is to assess "the evidence's relevancy and probative value," and we are to reverse the district court "[r]arely and only after a clear showing of prejudicial abuse of discretion."[31]

At trial, Arturo testified that the VCE often used rental cars to further their kidnapping pursuits. Arturo also testified that Gurrola and his cohorts used rental cars to conduct surveillance of the murder victims and to watch at

---

[28] *See United States v. Lockhart*, 844 F.3d 501, 512 (5th Cir. 2016) (distinguishing between intrinsic and extrinsic evidence).

[29] Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but nevertheless such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

[30] *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (en banc).

[31] *United States v. Shaw*, 701 F.2d 367, 386 (5th Cir. 1983), *abrogated on other grounds by Greer v. Miller*, 483 U.S. 756, 763 (1987).

least one of the murders. The Government then introduced rental car records, which indicated that VCE members frequently rented cars. After fully reviewing the records and Arturo's testimony as to rental car usage, we believe the complained of evidence was at least minimally relevant to Gurrola's plan and modus operandi. In any event, the rental car records were not unfairly prejudicial. The jury learned through Gurrola's own statements about the scope of Gurrola's and the VCE's illegal operations, which included brutal murders, kidnappings, and related lawlessness, and there was a substantial amount of corroborating evidence connecting Gurrola to the murders. The district court thus did not abuse its broad discretion by admitting this evidence.[32]

The final piece of other act evidence Gurrola complains of is Dr. Juan Contin's ("Dr. Contin") testimony regarding Alan Garcia's death. After the Government introduced evidence that Alan was killed while conducting a kidnapping in Mexico, it called the El Paso medical examiner, Dr. Contin, who testified about Alan's cause of death.[33] This testimony was not relevant. It pertained to the death of a man not on trial and events unrelated to those at issue. The district court's error in admitting Dr. Contin's testimony, however, was harmless. In light of the copious evidence before the jury and the lack of a direct link between Gurrola and Dr. Contin's testimony, the admission of that testimony did not have a substantial impact upon the jury verdict.[34]

---

[32] *United States. v. Bloom*, 538 F.2d 704, 708 (5th Cir. 1976) (noting that the district court has "broad discretion" when evaluating the admissibility of 404(b) evidence).

[33] Dr. Contin's testimony was not offered to "prove [Gurrola's character] in order to show that on a particular occasion [he] acted in accordance with the character." FED. R. EVID. 404(b)(1). Thus, we analyze the its admissibility solely under Federal Rule of Evidence 403.

[34] *See United States v. El-Zoubi*, 993 F.2d 442, 446 (5th Cir. 1993) ("[W]e must consider the other evidence in the case, and then decide if the inadmissible evidence actually contributed to the jury's verdict."); *see also United States v. Evans*, 892 F.3d 692, 714 (5th Cir. 2018) (explaining that non-constitutional errors are subject to the "substantial and injurious" standard).

No. 17-50325

**D. The district court's application of Rule 403**

In his fourth claim of trial error, Gurrola's assault on the evidentiary rulings continues. He asserts that, regardless of the district court's rulings on hearsay and other acts, the district court should have excluded much of the Government's evidence under Federal Rule of Evidence 403. We review a district court's Rule 403 determination for abuse of discretion.[35] Exclusion under Rule 403 is "an extraordinary remedy"[36] that we employ "cautious[ly]" and "sparing[ly]"[37]—only when there has been "a clear abuse of discretion."[38]

First, Gurrola argues that Dr. Contin's testimony regarding Francisco, Ruth, and Roberto's autopsy reports, as well as the photographs of Francisco's body, should have been excluded as cumulative and unfairly prejudicial. Many of the photos are, as Gurrola contends, shocking. So too is Dr. Contin's testimony regarding the autopsy reports. However, it is generally not an abuse of discretion to admit such shocking evidence in a murder trial as long as it has nontrivial probative value.[39]

Here, the Government's theory of the case was that Gurrola wanted the murders to occur in Juarez and appear as if they were cartel-related. The cartel is known to commit exceedingly grisly murders. Therefore, to link Gurrola to these murders, it was crucial for the Government to show that the murders involved cartel-like behavior such as excessive gunshot wounds and the use of automatic weapons at close range. Accordingly, the photos and testimony regarding the autopsy reports had nontrivial probative value, and the district court did not clearly abuse its discretion in admitting them.

---

[35] *See United States v. Gadison*, 8 F.3d 186, 192 (5th Cir. 1993).

[36] *United States v. Thevis*, 665 F.2d 616, 633 (5th Cir. 1982).

[37] *United States v. Fields*, 483 F.3d 313, 354 (5th Cir. 2007).

[38] *United States v. Maggit*, 784 F.2d 590, 597 (5th Cir. 1986).

[39] *Fields*, 483 F.3d at 355 (involving grisly photos and autopsy reports).

16

No. 17-50325

Next, Gurrola argues that the district court should have excluded ski masks found in Gurrola's car years after the murders. It is undisputed that these ski masks were black with only the eye holes exposed. At trial, Silvia Mendez testified that her kidnappers used black ski masks with only the eyes exposed. Likewise, an eyewitness to Francisco's murder testified that the murderers wore black masks that exposed only their eyes. Though the masks were recovered well after the murders occurred, they were probative of the VCE's modus operandi.[40] Therefore, we cannot say that the district court clearly abused its broad discretion by admitting the masks.

Lastly, Gurrola contends that the district court should have excluded the testimony of Ruth's ex-husband, Edgardo Avalos, concerning his interaction with Gurrola and Gurrola's former counsel at a probate hearing following Ruth's death. Avalos testified that, while Gurrola was looking in his direction, Gurrola's former counsel approached Avalos and offered to cooperate in the probate proceedings if Avalos agreed to drop the sexual assault case.

Avalos's testimony is clearly probative of Gurrola's overarching desire to rid himself of the sexual assault case. Though this testimony may have harmed Gurrola's case, it shed additional light on Gurrola's motive for coordinating the murders. The district court did not clearly abuse its discretion by admitting this portion of Avalos's testimony.[41]

---

[40] *Cf. Dowling v. United States*, 493 U.S. 342, 344–45, 353 (1990) (finding that evidence of a defendant's prior robbery of a home was "circumstantially valuable" in proving he robbed a bank where on both occasions he wore a ski mask and carried a small pistol); *United States v. Ramirez*, 460 F. App'x 333, 335 (5th Cir. 2012) (finding that evidence of a separate bank robbery was admissible as evidence of modus operandi during trial for later bank robbery because clothing worn in both robberies was substantially similar).

[41] Gurrola also claims that his attorney's statements to Avalos are inadmissible hearsay. Rule 801(d)(2)(C), however, exempts statements "made by a person whom the party authorized to make a statement on the subject" from the hearsay definition.

No. 17-50325

**E. Denial of a motion for judgment of acquittal/new trial**

Gurrola next argues that the district court should have granted his motion for a judgment of acquittal or, alternatively, a new trial.[42] He argues that absent the district court's erroneous evidentiary rulings, the Government presented insufficient proof of overt acts and, consequently, did not meet its burden of proof for the three § 1956(a)(1) convictions or the four § 1958(a) convictions.[43] This argument ignores the reality of the lower court proceedings. At trial, the Government's evidence showed, among other things, that (1) Gurrola gave Alan money to purchase equipment necessary to complete the murders, (2) Dalia, Gurrola's sister, rented a car that Gurrola and Emmanuel used to conduct surveillance of Cinthia's murder, (3) Alan traveled to Juarez to murder Francisco, (4) Alan used Arturo's car to transport into the United States money that was stolen from Francisco's safe and used to compensate Alan for the murders, and (5) unidentified members of the conspiracy used a vehicle to travel to Cinthia's funeral and subsequently murder Ruth and Roberto. The Government presented ample proof of overt acts supporting all seven convictions. Thus, the district court did not err by denying Gurrola's motion for a judgment of acquittal and/or a new trial.

**F. The jury instructions**

Gurrola maintains that the district court erred by instructing the jury that it need not find that one of the conspirators committed an overt act in

---

[42] We review the denial of a motion for judgment of acquittal under a sufficiency of the evidence standard, *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005) and "assess whether a reasonable jury could have properly concluded, weighing the evidence in a light most deferential to the verdict rendered by the jury, that all of the elements of the crime charged had been proven beyond a reasonable doubt." *Id.* We review the denial of a motion for a new trial for an abuse of discretion, exercising "great caution." *United States v. Pratt*, 807 F.3d 641, (5th Cir. 2015) (quoting *United States v. Turner,* 674 F.3d 420, 429 (5th Cir. 2012)).

[43] We assume arguendo that the Government was required to prove an overt act to support the four § 1958(a) convictions.

order to convict Gurrola on four counts of conspiracy to cause travel in foreign commerce in the commission of murder-for-hire, 18 U.S.C. § 1958(a).

Gurrola did not object to the district court's instructions; therefore, we review for plain error only.[44] In the jury instruction context, "[p]lain error occurs only when the instruction, considered as whole, was so clearly erroneous as to result in the likelihood of a grave miscarriage of justice."[45] Even if the error is clear and affects a defendant's substantial rights, we do not consider it reversible unless it seriously affected the "fairness, integrity, or public reputation of judicial proceedings."[46]

Gurrola correctly notes that this Court, in *United States v. McCullough*, stated that "proving the conspiracy [to cause travel in foreign commerce in the commission of murder-for-hire] requires proof of ' . . . an overt act committed by any one of the conspirators in furtherance of the conspiratorial object.'"[47] The Government contends, however, that this statement is non-binding in light of *Whitfield v. United States*.[48]

In *Whitfield*, the Supreme Court held that a conviction for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) does not require proof of an overt act.[49] In so holding, the Court clarified the governing rule for interpreting conspiracy statutes: there is no overt act requirement unless Congress either expressly provides for one or cross-references the general conspiracy statute (18 U.S.C. § 371) which deviates from the common law rule

---

[44] *United States v. Davis*, 19 F.3d 166, 169 (5th Cir. 1994).

[45] *Id.*

[46] *Puckett*, 505 F.3d at 384 (quoting *United States v. Calverley*, 37 F.3d 160, 164 (5th Cir. 1994)).

[47] *United States v. McCullough*, 631 F.3d 783, 791–92 (5th Cir. 2011) (quoting *United States v. Blackthorne*, 378 F.3d 449, 453 (5th Cir. 2004)).

[48] 543 U.S. 209 (2005).

[49] *Id.* at 214.

and requires an overt act.[50] Because, like § 1956(h), § 1958(a) does not expressly require an overt act,[51] the Government argues that it was unnecessary for the jury to find an overt act to convict Gurrola.

Though the Government's argument is persuasive, we need not decide how *McCullough* intersects with *Whitfield* because, even if the district court erred in its instructions, that error was not plain for two independent reasons. First, based on the discussion of *Whitfield* above, any error by the district court was not clear or obvious.[52] Second, the district court's instructions, viewed in context,[53] essentially required the jury to find that an overt act was committed. In order to find Gurrola guilty of counts four through seven, the district court required the jury to find that Gurrola (1) knowingly conspired (2) with at least one other person (3) with the intent to cause another person to travel in foreign commerce, (4) with the intent that the victim be murdered in violation of the laws of the United States, (5) with the intent that the murder be committed as consideration for something of pecuniary value, and (6) that the death of the victim resulted. That is, the jury had to find that *the death of the victim resulted*

---

[50] *Id.*

[51] *Compare* 18 U.S.C. § 1956(h) ("Any person <u>who conspires to commit</u> any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.") (emphasis added) *with* 18 U.S.C. § 1958(a) ("Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, <u>or who conspires to do so</u>, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.") (emphasis added).

[52] *See United States v. DeLeon*, 484 F. App'x 920 (5th Cir. 2012) (finding no plain error where a district court failed to instruct a jury that in needed to find an overt act in order to convict the defendant of conspiracy to harbor certain aliens).

[53] *See Hamling v. United States*, 418 U.S. 87, 107–08 (1974) (noting that jury instructions "are to be judged as a whole").

*from* Gurrola's conspiratorial conduct. To find that the ultimate object of the conspiracy—the murder—was achieved, the jury necessarily had to find that one of the conspirators committed an overt act in furtherance of the murder. In this context, the district court's omission of an explicit overt act instruction was not plain error.

### G. Cumulative error doctrine

Gurrola's final claim of trial error is that the trial was so tainted with error that his convictions must be set aside.[54] After a careful review of the record, we are left with the impression of a fair, well-conducted trial. Therefore, we decline to invoke the cumulative error doctrine.[55]

### H. The district court's sentencing

Next, Gurrola contends that the district court procedurally erred when it failed to explain its decision to impose consecutive sentences in open court, as mandated by 18 U.S.C. § 3553(c). Because there was no objection below, we review for plain error only.[56]

Section 3553(c) directs "[t]he court, at the time of sentencing, [to] state in open court the reasons for its imposition of the particular sentence."[57] Here, the court did not do so. Rather, it issued a written Statement of Reasons in which it explained that consecutive sentences were justified because the crimes involved extreme conduct, weapons, and death. The court further explained, in

---

[54] "[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain error failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc) (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998)).

[55] The cumulative error doctrine is applied "only in rare instances," and "[i]ts application is especially uncommon where, as here, the government presents substantial evidence of guilt." *Id.* at 344 (citing *United States v. Neal*, 27 F.3d 1035, 1051–1052 (5th Cir. 1994)).

[56] *Davis*, 19 F.3d at 169.

[57] 18 U.S.C. § 3553(c).

detail, that Gurrola's callous behavior and the gruesomeness of the murders warranted consecutive sentences.

This written, rather than oral, explanation does not strictly comply with 3553(c). Nevertheless, Gurrola must still show plain error. Gurrola cannot do so, because he cannot show that the district court's sentencing procedure affected his "substantial rights."[58]

## I. The district court's imposition of an amended judgment that increased restitution

Lastly, Gurrola challenges the substance of his sentence—specifically, the final restitution order. Gurrola maintains that the district court committed plain error by failing to finally determine the amount of restitution owed either at or before the sentencing hearing, or within 90 days thereafter.

It is settled law that "a sentencing court that misses the 90–day deadline [in 18 U.S.C. § 3664(d)(5)] nonetheless retains the power to order restitution—at least where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount."[59] That is precisely what happened here.

At the sentencing hearing on March 24, 2017, the Government argued that the court should defer a final determination of the amount of restitution owed because the victims' families misunderstood their ability to seek restitution and had difficulty completing the necessary paperwork. The court

---

[58] *See United States v. Whitelaw*, 580 F.3d 256, 263–64 (5th Cir. 2009) (finding that a district court's failure to explain in open court its reasons for imposing an above guidelines sentence did not affect a defendant's substantial rights because the district court's reasons were apparent from the record). Here, it is undisputed both that the district court had discretion to order consecutive sentences based on Gurrola's behavior and the circumstances of the crimes and that the court offered justification for the consecutive sentences in its Statement of Reasons. *See* 18 U.S.C. § 3553(a) (allowing a sentencing court to consider "the nature and circumstances of the offense" and the "characteristics" of the defendant).

[59] *See, e.g.*, *Dolan v. Unites States*, 560 U.S. 605, 611 (2010); *United States v. Bell*, 514 F. App'x 423 (5th Cir. 2013) (same).

No. 17-50325

then tentatively set the amount of restitution at $1,024,000 but noted that the amount "is subject to change" based on any documents that the Government "may file." On June 7, 2017, the Government filed a "Motion Regarding Restitution Issues" contending that the victims' losses were not readily ascertainable ten days prior to sentencing due to the families' confusion and, therefore, the court was permitted to determine the final amount of restitution at a later date. On August 11, 2017, after considering the Government's motion and the fourth addendum to the pre-sentence report, the court increased the amount of restitution to $1,550,247.15.[60]

Thus, the district court did not err by amending the final restitution order more than 90 days after the sentencing hearing.

## III.  CONCLUSION

For these reasons, we AFFIRM Gurrola's conviction and sentence.

---

[60] The restitution award was increased to reflect lost earnings and funeral expenses attributable to Roberto and Cinthia. Though the amended order was not entered until August 11, the Government notified both the court and Gurrola via letter on May 30, 2017—within the 90–day period—that it was seeking to incorporate these expenses into the final restitution order.