# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 14, 2022

Lyle W. Cayce
Clerk

No. 16-30995

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

TELLY HANKTON; WALTER PORTER; KEVIN JACKSON; ANDRE HANKTON,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:12-CR-1

Before DENNIS, SOUTHWICK, and WILSON, *Circuit Judges*.

CORY T. WILSON, *Circuit Judge*:

Telly Hankton, Andre Hankton,[1] Walter Porter, and Kevin Jackson were convicted of numerous crimes stemming from their participation in a violent New Orleans street gang. We affirm their convictions in large part, vacate in part, and remand for further proceedings.

---

[1] Telly and Andre are cousins who share a last name. For ease of reference, we refer to them hereafter by their first names.

No. 16-30995

## I. General Background[2]

The defendants were members of the Hankton Enterprise, a gang led by Telly that sold drugs in the Central City neighborhood of New Orleans. In January 2004, a turf war erupted between the Hankton Enterprise and a rival gang led by Brian Broussard. The feud sparked several shootings and led to at least seven murders. In particular, four violent interactions form the basis of many of the defendants' convictions: (1) the murder of Darnell Stewart, (2) the murder of Jesse Reed, (3) the attempted murder of a daquiri shop owner, and (4) the murder of the daquiri shop owner's brother.

Stewart and Reed were members of Broussard's gang; they killed Hankton Enterprise member George Hankton[3] on December 17, 2007. A few months after George's murder, Andre—with Telly riding in the passenger seat—tailed a vehicle driven by Stewart down the "neutral ground" of Claiborne Avenue. Shortly, Stewart exited his still-moving vehicle, which crashed into a dumpster, and took off on foot across the street toward a daquiri shop. Andre stopped next to Stewart's vehicle, and Telly jumped out and gave chase. Before Telly could reach Stewart, Andre hit the gas and rammed his vehicle into Stewart, causing him to fly "end over end" into the air and collapse on the ground. As Stewart lay there, Telly stood over him and shot him approximately ten times before running away. With Stewart dead, Andre sped off in a different direction. After the murder, the owner of the daquiri shop, who witnessed the crime, provided video surveillance footage from the store's security cameras to the police.

Biding time, Telly hired Porter about a year later to murder Reed in further payback for George's death. Because Porter did not know what Reed

---

[2] The recounted facts are drawn from the testimony adduced during trial.

[3] George Hankton was Andre's brother and Telly's cousin.

looked like, he met Telly and Jackson on June 20, 2009, to hunt for Reed together. When they found Reed outside a restaurant, all three men exited Telly's vehicle and began shooting. Jackson shot into a crowd of people, Telly shot Reed's legs, and Porter unloaded "both of his clips from both of his guns in [Reed's] face and body." Reed was shot 50 times and died from his injuries.

A few months later, Telly, who was in prison for his involvement in Reed's murder, ordered the killing of the daquiri shop owner who provided the video footage of Stewart's murder to the police. In October 2010, a Hankton Enterprise member shot the daquiri shop owner 17 times but did not kill him. A year later, Porter shot and killed the daquiri shop owner's brother, ostensibly a revenge killing as well.

On June 19, 2014, a federal grand jury in the Eastern District of Louisiana indicted Telly, Andre, Porter, Jackson, and nine others for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), the Federal Controlled Substances Act, the Federal Gun Control Act, and the Violent Crimes in Aid of Racketeering Act (VICAR) in a 24-count indictment.[4] Two years later, the district court held a three-week trial that included dozens of exhibits and testimony from over 70 witnesses. The jury convicted the defendants on some charges and acquitted them on others.

---

[4] Telly, Andre, Porter, and Jackson were not charged in Counts 19, 20, and 24. Counts 19 and 20 charged three other defendants with Conspiracy to Commit Misprision of a Felony and with Accessory After the Fact to Murder. Count 24 charged a different defendant with perjury. Telly and two other defendants were charged in Count 23 with Conspiracy to Launder Money, but Telly does not challenge his money laundering conspiracy conviction on appeal. Telly, Andre, Porter, and Jackson's nine co-defendants pled guilty and are not parties to this appeal.

No. 16-30995

In November 2016, the district court sentenced the defendants. Their convictions and resulting sentences are summarized in the following chart:

No. 16-30995

|  | Telly | Porter | Andre | Jackson |
|---|---|---|---|---|
| Count 1: RICO Conspiracy | Life | Life |  | Life |
| Count 2: Conspiracy to Distribute Controlled Substances | Life |  |  | Acquitted |
| Count 3: Conspiracy to Possess Firearms (18 U.S.C. § 924(o)) | 240 months | 240 months | 240 months | Acquitted |
| Count 4: Conspiracy to Obstruct Justice |  | 240 months |  |  |
| Count 5: Murdering Darvin Bessie in Aid of Racketeering | Life |  |  |  |
| Count 6: Causing Bessie's Death Through the Use of a Firearm (18 U.S.C. § 924(j)) | Life |  |  |  |
| Count 7: Murdering Stewart in Aid of Racketeering | Life |  | Acquitted |  |
| Count 8: Causing Stewart's Death Through the Use of a Firearm (18 U.S.C. § 924(j)) | Life |  | Life |  |
| Count 9: Possession of Sawed-Off Shotgun |  |  | 120 months |  |
| Count 10: Murdering Reed in Aid of Racketeering | Life | Life |  | Life |
| Count 11: Causing Reed's Death Through the Use of a Firearm (18 U.S.C. § 924(j)) | Life | Life |  | Acquitted |
| Count 12: Murdering Hasan Williams's in Aid of Racketeering |  | Life |  |  |
| Count 13: Causing Williams's Death Through the Use of a Firearm (18 U.S.C. § 924(j)) |  | Life |  |  |
| Count 14: Felon in Possession of a Firearm |  | 120 months |  |  |
| Count 15: Assaulting the Daquiri Shop Owner with a Dangerous Weapon in Aid of Racketeering | Acquitted | 240 months |  |  |
| Count 16: Use and Carrying of a Firearm During and in Relation to a Crime of Violence and a Drug Trafficking Crime against the Daquiri Shop Owner (18 U.S.C. § 924(c)) | Acquitted | 120 months |  |  |
| Count 17: Murdering the Daquiri Shop Owner's Brother in Aid of Racketeering |  | Life |  |  |
| Count 18: Causing the Daquiri Shop Owner's Brother's Death Through the Use of a Firearm (18 U.S.C. § 924(j)) |  | Life |  |  |
| Count 21: Felon in Possession of a Firearm |  | 120 months |  |  |
| Count 22: Felon in Possession of a Firearm |  | 120 months |  |  |

No. 16-30995

The defendants filed timely notices of appeal, raising a number of issues:  (1) Andre, Porter, and Telly challenge their convictions under 18 U.S.C. § 924; (2) Andre and Telly contend their restitution order should be vacated; (3) Telly challenges the admission of various evidence at trial; (4) Porter contends that the district court erred in concluding that he was competent to stand trial; (5) Telly, Porter, and Jackson assert that the district court erred in denying their motions to sever their trials; (6) all four defendants contend that the district court erred in denying their motions for sanctions or dismissal of the second superseding indictment after an alleged leak of grand jury information to a New Orleans newspaper; (7) Jackson contends that the district court erred by neglecting to instruct the jury that it was required unanimously to find him guilty of Reed's murder either as a principal or as an accomplice; (8) Jackson challenges the sufficiency of the evidence to support his convictions for RICO conspiracy and for murdering Reed; and (9) Andre, Porter, and Jackson assert that cumulative errors mandate reversal.  We discuss each issue and additional facts specific to the defendants' contentions in turn.

## II. Discussion

### A. Andre & Porter's 18 U.S.C. § 924 Convictions

Andre and Porter challenge their convictions under the Federal Gun Control Act, 18 U.S.C. § 924.  Specifically, Porter was convicted of violating §§ 924(c), 924(j), and 924(o) (Counts 3, 11, 13, 16, and 18); Andre was convicted of violating §§ 924(j) and 924(o) (Counts 3 and 8).  Section 924(c) "threatens long prison sentences for anyone who uses a firearm in connection with" any crime of violence or drug trafficking crime.  *United States v. Davis*, 139 S. Ct. 2319, 2323, 2327 (2019).  Section 924(j) "applies to people who cause death in the course of [a] violation of § 924(c)."  *United States v. McClaren*, 13 F.4th 386, 412–13 (5th Cir. 2021).  Finally, § 924(o)

provides that "[a] person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years." Andre and Porter contend, and the Government acknowledges, that their § 924 convictions may have been erroneously predicated on a RICO conspiracy, which is not a crime of violence. *See United States v. Jones*, 935 F.3d 266, 271 (5th Cir. 2019).

We review this unpreserved claim for plain error. *McClaren*, 13 F.4th at 413. To prevail, an appellant must clear four hurdles:

> (1) there must be an error; (2) the error must be "clear or obvious, rather than subject to reasonable dispute"; (3) "the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings"; and (4) the court must decide in its discretion to correct the error because it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."

*Jones*, 935 F.3d at 271 (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)) (internal quotation marks omitted).

In *Jones*, gang members were convicted of "racketeering, drug, and firearm offenses—including several offenses under 18 U.S.C. § 924." *Id.* at 268. "For each § 924 offense, the indictment charged a [RICO] conspiracy . . . as a predicate crime of violence, and a controlled-substance conspiracy . . . as a predicate drug trafficking crime." *Id.* at 269. "The verdict form did not require the jury to specify which predicate offense or offenses it relied upon in convicting [the] [a]ppellants of the § 924 offenses." *Id.* On appeal, the *Jones* appellants contended that their § 924(c) convictions could not be predicated on RICO conspiracy because RICO conspiracy is not a crime of violence under *Davis*. *Id.* Reviewing for plain error, the *Jones* panel ultimately agreed and concluded that there was "a reasonable probability

that, but for the error, the outcome of the proceeding would have been different." *Id.* at 272 (citing *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016)) (internal quotation marks omitted). Specifically, "the jury could have convicted on the § 924 counts by relying on either the invalid crime of violence predicate[, i.e., RICO conspiracy,] or [an] alternative drug trafficking predicate." *Id.* The court vacated the convictions because "the *Davis* error . . . increased [the] [a]ppellants' sentences significantly and even resulted in additional life sentences for" some of them. *Id.* at 271.

We face an identical situation. It was a "clear or obvious" error to permit the jury to convict Andre and Porter under § 924 without specifying which conspiracy was the predicate offense. *Id.*; *see McClaren*, 13 F.4th at 412–14. And the error affected Andre's and Porter's substantial rights. Each § 924 count under which Porter and Andre were charged was predicated on the charged RICO conspiracy *and* the alleged conspiracy to distribute controlled substances. Because "[t]he verdict form did not require the jury to specify which predicate offense or offenses it relied upon," *Jones*, 935 F.3d at 269, there is a reasonable probability that the jury improperly relied on "nonviolent" RICO conduct to convict Andre and Porter under § 924, *see id.* at 273; *McClaren*, 13 F.4th at 414. As in *Jones*, we choose to correct the *Davis* error because Andre and Porter each potentially received additional life sentences as a result. *See Jones*, 935 F.3d at 271.

The wrinkle is that the parties disagree as to the proper remedy. Porter contends that his convictions should simply be vacated, Andre argues that his § 924 convictions should be reversed, and the Government asserts that the convictions should be vacated and remanded for further proceedings. As to Porter at least, we follow *Jones* and vacate his § 924 convictions and remand for a new trial. But Andre contends that reversal of his § 924 convictions is required because there is insufficient evidence to support them based solely on a drug trafficking conspiracy predicate.

At trial, Andre moved for judgment of acquittal at the close of all evidence. He asserted that there was insufficient evidence to convict him under § 924(j) or § 924(o) because multiple witnesses testified that "they never knew Andre, they didn't buy any drugs from Andre, and [Andre] was not actively involved" in the RICO conspiracy or the drug trafficking conspiracy. The district court denied the motion, reasoning that "[i]t is not the Court's responsibility to take the case away from the jury unless the Court finds that no rational juror could have found the way it did." Reprising his sufficiency challenge on appeal, Andre contends that once the RICO conspiracy conviction is removed from the calculus, he is entitled to acquittal on his § 924 charges, such that remanding for a new trial would be improper.

"[A]fter the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). Moving for acquittal under Rule 29(a) preserves a sufficiency challenge for appeal. *United States v. Evans*, 892 F.3d 692, 702 (5th Cir. 2018). We review these challenges "de novo but 'highly deferential to the verdict.'" *Jones*, 873 F.3d at 489 (quoting *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014); *see United States v. Delgado*, 672 F.3d 320, 330 (5th Cir. 2012) (en banc). We may reverse a conviction only when "no rational jury could have found the offenses' essential elements proven beyond a reasonable doubt." *McClaren*, 14 F.4th at 400 (citing *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016)). "[A]ppellate court reversal of a conviction for insufficient evidence is the functional equivalent of a verdict of acquittal and thus bars reprosecution for the same offense." *United States v. Miller*, 952 F.2d 866, 871 (5th Cir. 1992) (citing *Burks v. United States*, 437 U.S. 1, 10–18 (1978)).

Andre argues that there is insufficient evidence to conclude that he knew about the drug trafficking conspiracy and acted with intent to further that conspiracy. Regarding his § 924(o) conviction, Andre asserts that mere

involvement with Telly in Stewart's murder "is insufficient to prove that they also worked together to possess firearms" in furtherance of the drug trafficking conspiracy. As to his § 924(j) conviction, Andre contends that no rational juror could convict him based solely on a drug trafficking conspiracy predicate because there is no evidence that he specifically intended to further that conspiracy by aiding and abetting Telly in murdering Stewart.

The Government counters by pointing to testimony that the Hankton family was well known for selling drugs and for violence, other family members participated in the drug conspiracy, and Telly's feud with Broussard spanned three years and was widely known. Notably, Andre does not dispute that he was driving the car that struck Stewart, he intended to kill Stewart, Telly was in the car with him shortly before he struck Stewart, and Telly exited the car and shot Stewart multiple times after Andre rammed Stewart with the car. Andre disputes only that he had knowledge of the Hankton drug trafficking conspiracy or the intent to further it.

We cannot say at this juncture that *no* reasonable juror could find Andre guilty under either § 924(j) or § 924(o) based on a drug trafficking conspiracy predicate. *See* Fed. R. Crim. P. 29(a); *McClaren*, 13 F.4th at 400; *Delgado*, 672 F.3d at 330. It is true that, as Andre argues, there was unrebutted evidence that he did not sell drugs; he was a merchant marine who was absent from New Orleans for extended periods; and he helped Telly murder Stewart as retaliation for Stewart's murdering Andre's brother. But an individual co-conspirator's engaging in drug dealing itself is not a prerequisite for participation in a drug trafficking conspiracy. The jury could have believed that Andre did not sell drugs, but also believed that he acted in furtherance of the conspiracy in other ways—such as participating in the murder of Stewart. Likewise, his absence for periods of time did not preclude his knowledge of and participation in the conspiracy. On balance, the evidence, viewed in the light most favorable to the verdict, is sufficient to find

No. 16-30995

that Andre had knowledge of the drug trafficking conspiracy, given Andre's relation to drug-dealers Telly and George, the notoriety of the Hankton Enterprise, and that Andre and Telly tracked down and murdered one of Telly's drug trade rivals together.

Andre's intent is a closer question. The Government cites no evidence explicitly substantiating Andre's intent, while Andre points to evidence that he helped Telly kill Stewart solely to avenge George Hankton's murder. But even if the jury agreed that Andre's involvement in Stewart's death was motivated by revenge, a reasonable juror could *also* conclude that Andre intended to further Telly's drug trafficking conspiracy as well. Importantly, the jury was entitled to weigh and disregard the evidence that Andre cites, which it evidently did. At this stage, the court's analysis must focus on the evidence that *supports* the verdict—not that which goes against it. *See United States v. Flax*, 988 F.3d 1068, 1075 (8th Cir. 2021) (holding that there was sufficient evidence to support a conviction when "the jury was permitted to accept or reject the[] theories at trial" that were later advanced on appeal, even if the evidence "rationally supports conflicting hypotheses" (quotation omitted)). Through that lens, we conclude that the evidence of Andre's knowledge of and involvement in the drug trafficking conspiracy is sufficient to merit a remand of his § 924 charges for a new trial.

In sum, we vacate both Porter's and Andre's § 924 convictions under Counts 3, 8, 11, 13, 16, and 18, and remand for further proceedings.

## B. Telly's § 924 Convictions

In challenging his § 924 convictions under Counts 3, 6, 8, 11, and 16, Telly purports to adopt Andre's and Porter's *Davis* error arguments. *See*

No. 16-30995

Fed. R. Civ. P. 28(i).[5] The Government contests whether adoption is permissible, contending that the fact-specific nature of the *Davis* issue requires Telly to assert independent arguments on appeal. We conclude that Telly may properly raise his *Davis* challenge by adopting his codefendants' arguments.

"In a case involving more than one appellant or appellee, . . . any party may adopt by reference a part of another's brief." Fed. R. App. P. 28(i). However, fact-specific challenges to a defendant's conviction may not be adopted by a co-defendant on appeal. *United States v. Solis*, 299 F.3d 420, 434 n.3 (5th Cir. 2002); *United States v. Alix*, 86 F.3d 429, 434 n.2 (5th Cir. 1996). Severance issues, for example, are fact-specific, *Solis*, 299 F.3d at 441 n.46, as are "sufficiency-of-the-evidence challenges or challenges to the application of the sentencing guidelines," *Alix*, 86 F.3d at 434 n.2 (citation omitted).

Here, Telly seeks to adopt a legal rather than fact-specific argument: The jury was erroneously permitted to convict Telly of § 924 offenses without "specify[ing] which predicate offense or offenses it relied upon," thus creating a "reasonable probability" that the jury improperly relied on "nonviolent" RICO conduct to convict him. *Jones*, 935 F.3d at 269, 273. This argument springs from the same flaw in the jury instructions that permitted the jury to rely on an improper predicate to convict Andre and Porter. Telly may therefore adopt their argument. And the Government

---

[5] Both Telly and Porter generally assert that they "adopt[] any arguments made by [their] codefendants in advance of claims commonly presented in their briefs on appeal." However, we address only the issues they explicitly identify: Telly's adoption of his co-defendants' *Davis* error arguments and a couple instances, discussed *infra*, in which the parties agree to the adoption or the defendants purport to adopt fact-specific arguments not amenable to adoption under Rule 28(i). *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).

correctly concedes that if so, we must vacate and remand Telly's § 924 convictions. Accordingly, we vacate Telly's § 924 convictions under Counts 3, 6, 8, 11, and 16, and remand for further proceedings.

## C. Restitution Orders

The Government sought restitution from Telly, Andre, and Porter for their roles in shooting the daquiri shop owner, pursuant to the Mandatory Victims Restitution Act (Restitution Act). *See* 18 U.S.C. § 3663A(a)(1) (providing that sentencing court "shall order . . . that the defendant make restitution to the victim of" a crime of violence). The district court agreed and held Telly, Andre, and Porter jointly and severally liable for restitution for the shop owner's loss of value of his home, commercial property, and business resulting from the defendants' crimes.[6]

Andre and Telly now challenge the restitution order, contending that the district court erred because their RICO conspiracy convictions do not constitute a crime of violence under the statute. *See id.* § 3663A(c)(1)(A)(i). We agree, for the reasons discussed *supra* regarding defendants' § 924 convictions.[7] As a result, and as the Government correctly concedes, we must vacate and remand the restitution order as it pertains to Telly and Andre.

---

[6] The district court entered a single order on February 8, 2017, finding Andre, Porter, and Thomas Hankton jointly and severally liable for $1.6 million in restitution. On August 21, 2017, the district court effectively amended its prior order by finding Telly jointly and severally liable for the restitution amount with Andre, Porter, and Thomas Hankton. Because Thomas Hankton is not a party to this appeal, we do not address the restitution order as it pertains to him.

[7] Telly preserved his challenge to the restitution order, but Andre did not. Regardless, under either de novo or plain error review, we must vacate and remand the restitution order. *See United States v. Maturin*, 488 F.3d 657, 660 (5th Cir. 2007).

Porter did not initially challenge the restitution order; he belatedly raised the issue in his reply brief. Because he failed to argue the issue in his opening brief, his challenge to the restitution order is forfeited. *See United States v. Zuniga*, 860 F.3d 276, 285 n.9 (5th Cir. 2017) (quoting *United States v. Bowen*, 818 F.3d 179, 192 n.8 (5th Cir. 2016)). In the normal course, that would be the end of our discussion. But the Supreme Court has admonished us to "correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings.'" *United States v. Olano*, 507 U.S. 725, 736 (1993) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). Regarding the restitution order here, the Government concedes plain error, and that the error affects the defendants' substantial rights. And the district court found Telly, Andre, and Porter jointly and severally liable for restitution, compounding the impact on Porter if we vacate only as to Telly and Andre. Because the error thus "seriously affect[s] the fairness . . . of judicial proceedings" as to Porter, *Atkinson*, 297 U.S. at 160, we vacate and remand the restitution order as it pertains to Porter as well.

## D. Telly's Evidentiary Challenges

Telly contests various evidentiary rulings by the district court. First, he challenges the denial of his motion to suppress two witness identifications based on "unduly suggestive" photo arrays. Next, he challenges the court's admission of witness testimony under the forfeiture by wrongdoing hearsay exception. Third, he contends that the district court erred by admitting a portion of a music video as an adoptive admission of Porter because Telly "could not cross examine the statements made therein." Fourth, he maintains that the prosecution improperly withheld evidence favorable to Telly, and that the district court erred by permitting a witness to assert his Fifth Amendment privilege against self-incrimination. Finally, Telly challenges the denial of his motion for judgment of acquittal.

No. 16-30995

### 1. Photo Arrays

During trial, the prosecution introduced two out-of-court witness identifications, derived from two six-person photo arrays, of Telly as the person who killed Stewart (the "Stewart murder identifications"). Telly moved to suppress the Stewart murder identifications on the basis that the photo arrays were "unduly suggestive" because (1) the two witnesses who identified him were shown the same six photos, albeit in different order; (2) Telly appeared significantly smaller in his photo compared to the people in the other photos; (3) Telly's photo was brighter than the other photos and, unlike the others, lacked a shadow in the background; (4) Telly had a lighter mustache and a fuller beard than the other individuals; and (5) Telly was wearing a sweatshirt while the other individuals were wearing t-shirts. Telly emphasized that the lack of a full beard on the other individuals was significant because both witnesses had previously told the police that the man who killed Stewart had a beard, "[t]he beard caught [their] attention," and the beard was "full" or "very thick."

The district court denied Telly's motion without a hearing, concluding that neither of the photo arrays was impermissibly suggestive. The court determined that "the photos contain differences that one would reasonably expect to see in six different photos of six different people," concluding that there were no incriminating features that caused Telly's photo to stand out from the rest.[8]

---

[8] In addition to the photo arrays used in the Stewart murder identifications, Telly's motion to suppress challenged two others shown to witnesses who identified him as one of Reed's murderers. On appeal, Telly contends that the district court erred in denying his motion in this respect too. However, the Government never introduced these identifications into evidence, so we need not address them further.

15

No. 16-30995

Preliminarily, Telly contends that the district court erred by ruling on his motion to suppress without first conducting an evidentiary hearing. "Evidentiary hearings are not granted as a matter of course, but are held only when the defendant alleges sufficient facts which, if proven, would justify relief." *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983) (citations omitted). The district court is "left with a certain amount of discretion" in deciding whether a hearing is warranted. *Id.* (internal quotation marks omitted).

The day that Telly filed his motion to suppress, the Government disclosed that New Orleans Police Department detective Desmond Pratt had improperly influenced two witness identifications while investigating Reed's murder. Telly contends that a hearing was necessary to establish that Pratt also improperly influenced the Stewart murder identifications. Telly's theory is that because Pratt fabricated evidence in the Reed investigation, Pratt must have influenced his colleague, Orlando Matthews, to do the same in the Stewart investigation. Telly also contends that the identification procedures were unduly suggestive because Matthews, not the witnesses, first mentioned Telly during the photo identification process.

But Telly offers no proof that Matthews fabricated evidence or that Pratt influenced the Stewart murder identifications in any way. To the contrary, Telly concedes that Pratt was not involved in the Stewart investigation, and he rested his case during trial without calling Matthews to testify. The record likewise does not support Telly's assertion that Matthews rendered the identification procedures unduly suggestive by his interactions with the witnesses. We find no abuse of discretion in the district court's determination that a hearing was unnecessary.

Turning to the merits, the Due Process Clause of the Fifth Amendment forbids the admission of unreliable identification testimony at

trial. *Manson v. Brathwaite*, 432 U.S. 98, 99, 114 (1977). Courts apply a two-prong test to determine whether a photo array should be excluded. *United States v. Davis*, 754 F.3d 278, 282 (5th Cir. 2014). "First, this court asks whether the photographic [array] is impermissibly suggestive; if it was not, the inquiry ends." *Id.* "If the photographic [array] was impermissibly suggestive, we ask whether considering the totality of the circumstances, the photographic display posed a very substantial likelihood of irreparable misidentification." *Id.* "Photo arrays may be suggestive if the suspect is the only person closely resembling the description, or if the subjects of the photographs are 'grossly dissimilar in appearance to the suspect.'" *United States v. Saenz*, 286 F. App'x 166, 169 (5th Cir. 2008) (quoting *United States v. Wade*, 388 U.S. 218, 233 (1967)). We review the district court's conclusion that the photo arrays were not impermissibly suggestive for clear error. *See McClaren*, 13 F.4th at 399; *Davis*, 754 F.3d at 282.

On appeal, Telly contends that the photo array was impermissibly suggestive because Telly was the only individual in the array with a "full," "very thick" beard, a physical characteristic highlighted by the identifying witnesses. The district court disagreed, and its conclusion is not clearly erroneous. *See Davis*, 754 F.3d at 282. All six men in the photo arrays have facial hair, and Telly's beard is not significantly different from any of the other individuals' facial hair. True, both of the identifying witnesses specifically referenced a beard. But because the subjects of the photographs were not "*grossly* dissimilar in appearance to the suspect," *Wade*, 388 U.S. at 233 (emphasis added), we cannot say "'with a definite and firm conviction that a mistake has been committed,'" *McClaren*, 13 F.4th at 399 (quoting *United States v. Bennett*, 664 F.3d 997, 1008 (5th Cir. 2011)); *cf. United States v. Smith*, 546 F.2d 1275, 1280 (5th Cir. 1977) (holding that a photo array was not impermissibly suggestive even though the suspect's hairstyle was "marked[ly]" different than the other individuals' hairstyles in the photo

array because, *inter alia*, the description that the witness gave to the FBI did not mention the suspect's hairstyle). Accordingly, we find no reversible error as to this issue.

### 2. Hasan Williams's Identification Testimony

Telly also challenges the admission of Hasan Williams's recorded statement and state grand jury testimony identifying Telly as Reed's killer. About two hours after Reed was murdered, Williams described the shooting to the police via the recorded statement. According to Williams, he and Reed went to a house after picking up some food the night of June 20, 2009. Reed was talking to someone on the phone in the car while Williams got out, walked to the porch, and began eating. While Williams was sitting on the porch, he saw a car turn onto the street and turn its headlights off about halfway down the block. As the car approached them, Williams stated that he had a "clear view" of Telly driving the vehicle. The car then sped up towards Williams and Reed. They took off running and split up. Williams heard multiple gunshots, and Reed was later found dead. He had been shot 50 times.

When officers showed Williams a picture of Telly, he positively identified Telly.[9] He also described the car that Telly was driving and stated that he saw two other individuals in the car but did not get a clear enough view to describe them to the police. Finally, Williams told the police that one individual stayed in the car while the other two got out with handguns and killed Reed. Less than a week after the shooting, on June 25, 2009, Williams testified before a Louisiana grand jury, repeating the information that he told

---

[9] As the district court found, "[t]he record reflects that Hasan Williams and Telly Hankton knew each other for years before the Jesse Reed murder." Therefore, Williams's identification of Telly through one photograph, rather than a full array, is not at issue as with other witnesses, discussed *supra*.

the police. About two weeks later, Williams was killed. Porter was charged and convicted as his killer in this case.

At trial, the Government sought to introduce both Williams's recorded statement from the night of Reed's murder and his state grand jury testimony. Telly moved to suppress the evidence, contending that the evidence was inadmissible hearsay and that its admission violated the Sixth Amendment's Confrontation Clause. *See* U.S. CONST. amend. VI. The district court denied Telly's motion and admitted both the statement and testimony, finding that the Government proved by a preponderance of the evidence that Telly had wrongfully caused or acquiesced in Williams's murder, such that the evidence was admissible under the forfeiture by wrongdoing exception to the hearsay rule.

Telly contends that the district court should have conducted an evidentiary hearing regarding Williams's statement and grand jury testimony. But Telly did not request a hearing. Accordingly, we review the district court's admission of the evidence without a hearing for plain error. *See McClaren*, 13 F.4th at 413; *United States v. Pena*, No. 93-7563, 1994 WL 558899, at *1 (5th Cir. 1994) (per curiam).

Telly argues that the district court erred because Williams's identification of Telly was "influenced" by Pratt, and an evidentiary hearing was necessary for Telly to "establish this allegation." But the district court did not circumvent Telly's ability to elicit evidence at trial regarding any communication Pratt had with Williams. As mentioned, Telly did not call Pratt's colleague Matthews to the stand, despite his assertion that Matthews would have testified in support of his theory. Telly thus fails to show error, plain or otherwise, in the district court's decision not to conduct a hearing. *See Jones*, 935 F.3d at 271.

Telly also renews his contention that the admission of Williams's grand jury testimony violated his Sixth Amendment right to confront witnesses against him.  Because Telly objected to the admissibility of this testimony at trial, we review the admission of the testimony under the forfeiture by wrongdoing doctrine "for abuse of discretion, subject to the harmless error standard." *United States v. Gurrola*, 898 F.3d 524, 533 (5th Cir. 2018) (quoting *United States v. Valas*, 822 F.3d 228, 239–40 (5th Cir. 2016)).  "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008)) (internal quotation marks omitted).

"The [Sixth] Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him." *Giles v. California*, 554 U.S. 353, 358 (2008).  There are, however, exceptions to this rule, including the doctrine of forfeiture by wrongdoing. *Id.* at 358, 367.

"[T]he rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds." *Davis v. Washington*, 547 U.S. 813, 833 (2006) (citation and internal quotation marks omitted).  An out-of-court statement is admissible as evidence if the declarant is unavailable as a witness and "[the] statement [is] offered against a party that wrongfully caused—or acquiesced in wrongfully causing—the declarant's unavailability as a witness, and did so intending that result." Fed. R. Evid. 804(b)(6); *see also Davis*, 547 U.S. at 833 (acknowledging that Rule 804(b)(6) codifies the forfeiture by wrongdoing doctrine).  The party invoking the rule carries the burden of showing by a preponderance of the evidence that the opposing party wrongfully and intentionally made the witness unavailable.

*See Davis*, 547 U.S. at 833 (citing *United States v. Scott*, 284 F.3d 758, 762 (7th Cir. 2002)).

Telly asserts that the district court's ruling was based on "a clearly erroneous assessment of the evidence," *Gurrola*, 898 F.3d at 533, because the prosecution did not establish by a preponderance of the evidence that Telly was involved in wrongfully causing or acquiescing in Williams's unavailability.  Specifically, Telly contends:  there was no evidence that he knew that Williams spoke to the police; he was incarcerated at the time Williams was killed, and thus he could not have been involved in Williams's murder; and he was not charged with any involvement in the murder.

Telly's assertions are belied by the record.  As the district court stated,

> [t]he record reflects that Hasan Williams and Telly Hankton knew each other for years before the Jesse Reed murder. Williams stated to police officers and to the grand jury that he clearly recognized [Telly] as the driver and one of the shooters. It is more likely than not that [Telly] clearly recognized Williams, as well. *Nine days* after Williams identified [Telly] before the state grand jury, he was gunned down, allegedly by [Porter,] the hitman for the Hankton organization.  To further narrow the likelihood of coincidence, the two .40 caliber guns used to kill Williams were ballistically linked to the same guns used to kill Reed.  The government has satisfied its preponderance burden under Rule 804(b)(6).

In addition, at trial, Aaron Smith testified that Porter told Smith that Porter killed Williams because Williams was a witness to Reed's killing.  There is also evidence that Porter told his acquaintance Brian Hayes that there was a witness to Reed's murder—Williams—and that Telly gave Porter $5,000 to kill him.

The district court's conclusion that Telly, at the very least, "acquiesced in wrongfully causing . . . [Williams's] unavailability as a

witness, and did so intending that result," FED. R. EVID. 804(b)(6), was not based on "a clearly erroneous assessment of the evidence," *Gurrola*, 898 F.3d at 533. We therefore find no abuse of discretion.

Separately, Telly avers that the district court admitted the evidence based on "an erroneous view of the law" because, according to Telly, the preponderance of the evidence burden of proof was insufficient "to protect [his] Sixth Amendment right to Confrontation." But our precedent clearly holds that the burden of proof to introduce evidence under Rule 804(b)(6) is the preponderance standard. *See Gurrola*, 898 F.3d at 534. The district court applied that standard and did not abuse its discretion in doing so. *Id.*; *see* FED. R. EVID. 804(b)(6).[10]

Lastly, Telly asserts that the district court erroneously applied the conspiratorial liability approach articulated in *Pinkerton v. United States*, 328 U.S. 640 (1946), in order "to get the [G]overnment's evidence over the line on the burden of preponderance of the evidence." He takes issue with a footnoted remark in the district court's order admitting the evidence that the Fourth Circuit "has applied conspiratorial principles to the forfeiture [by wrongdoing] doctrine, explicitly rejecting the argument that a defendant could not participate in a murder to silence a witness because the defendant was in prison at the time of the murder." (Citing *United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012)). But the district court's ruling turned not on

---

[10] Telly correctly states that this court has indicated that the burden of proof "may well be higher" if the "objection is rooted in the . . . Confrontation Clause" as opposed to Rule 804(b)(6). *See United States v. Nelson*, 242 F. App'x 164, 171 n.2 (citing *Davis*, 547 U.S. at 833). But the Government moved to introduce the evidence at issue here under Rule 804(b)(6), which Telly's counsel acknowledged in response. To the extent there is ambiguity as to whether Telly's objection was rooted in the Confrontation Clause, when the parties argued the motion before the district court, Telly's counsel conceded that the preponderance standard applied. *Accord Gurrola*, 898 F.3d at 534.

No. 16-30995

the Fourth Circuit's conspiratorial liability approach, but on the facts detailed above. The district court's reference to conspiratorial liability merely bolstered its conclusion that Telly's imprisonment at the time Williams was murdered did not preclude a finding that Telly caused or acquiesced in Williams's murder. *See* Fed. R. Evid. 804(b)(6). In short, we perceive no reversible error in the district court's admission of Williams's recorded statement or his state grand jury testimony into evidence.

### 3. "Guilty by Association" Video

Telly contests the admission into evidence of a rap music video as an adoptive admission by his codefendant Porter. At trial, the Government moved to introduce the video, entitled "Guilty by Association," in which Porter makes an appearance.[11] In the video, the rapper references both Reed's murder and Williams's murder. According to the record, the rapper states: "N\*\*\*as get too close to me, got my gat[12] in my hand. Turn around n\*\*\*a put one in the back of 'ya head. I keep them goonies around, who keep them toolies[13] around. N\*\*\*a get hit fifty times because my n\*\*\*a Moonie around." As the rapper mentions "Moonie," he pulls Porter close to him as Porter simultaneously puts his finger to his lips in a "shhh" sign. The evidence at trial indicated that Porter was known as "Moonie."

The district court allowed the rap video into evidence. It found that Porter took "active steps to manifest his approval" of the lyrics. The court

---

[11] The video clip can be viewed on YouTube. Young Gwap, *BG - Guilty By Association (OFFICIAL VIDEO)*, YouTube (Oct. 29, 2010), https://www.youtube.com/watch?v=OKQk6cxquto. The relevant lyrics begin at approximately 2:30.

[12] "Gat" is slang for "a pistol or revolver." *See Gat*, Dictionary.com, https://www.dictionary.com/browse/gat, (last visited May 5, 2022).

[13] The record states that "toolies" is "a slang term for a gun."

reasoned that Porter voluntarily appeared in the video, pointed at the camera, "gesture[d] to keep quiet as he [was] embraced by" the rapper, and only appeared during the "few seconds when [the rapper] mention[ed] 'Moonie' shooting someone 50 times," which was "no coincidence" given that Reed was shot 50 times. The district court concluded that Porter's actions were "braggadocios" and admissible as an adoptive admission. *See* FED. R. EVID. 801(d)(2)(B).

Telly argues that the district court abused its discretion by admitting the "Guilty by Association" video clip under Rule 801(d)(2)(B) as an adoptive admission of Porter for two reasons. First, Telly contends that he was never given an opportunity to challenge through cross-examination whether the video was an adoptive admission by Porter. Second, and more substantively, he asserts that the district court "mischaracterized" the contents of the video because the lyrics were not evidentiary "statements" but were instead merely artistic expression by the rapper.

We review de novo "the district court's legal conclusion about whether a statement is hearsay." *United States v. Reed*, 908 F.3d 102, 120 (5th Cir. 2018). "A district court's decision to admit or exclude evidence is reviewed for abuse of discretion . . . . Any error in admitting evidence is subject to harmless error review." *United States v. Ibarra*, 493 F.3d 526, 532 (5th Cir. 2007) (citations omitted); *see also United States v. Ragsdale*, 426 F.3d 765, 774–75 (5th Cir. 2005).

A "statement" for hearsay purposes is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." FED. R. EVID. 801(a). Under Rule 801(d)(2)(B), a statement is not hearsay if it "is offered against an opposing party and is one the party manifested that it adopted or believed to be true." Silence generally is not an adoptive admission, but the commentary to the rule notes that

"[a]doption or acquiescence may be manifested in any appropriate manner. When silence is relied upon, the theory is that the person would, under the circumstances, protest the statement made in his presence if untrue." Fed. R. Evid. 801(2)(B) advisory committee's note.

Telly's argument that he should have been allowed to cross-examine the rapper fails. Before the district court, Telly urged that he should be able to cross-examine the rapper "to talk about whether or not that statement was said in jest, . . . the veracity of the statement." However, the rapper's state of mind is irrelevant because, as the district court found, *Porter* adopted the statements in the video and was the one charged with involvement in both the conspiracies and murders at issue. It was therefore not an abuse of discretion to proceed without cross examination of the artist himself.

As for the substance of Porter's adoptive admission, i.e., the rap lyrics themselves, Telly's argument that the lyrics were not "statements" because they were artistic expressions subject to interpretation also lacks merit. The rap lyrics in the video clip were evidentiary statements within the meaning of Rule 801(a), and Porter's actions in the video "manifested that [he] adopted or believed [them] to be true." Fed. R. Evid. 801(d)(2)(B). Telly may well be correct that the lyrics were subject to interpretation, but that interpretation was within the province of the jury to determine. The district court did not abuse its discretion by admitting the video clip into evidence for the jury to consider.

Regardless, assuming the video clip contained hearsay and was improperly admitted, any error was harmless to Telly. The lyrics did not mention Telly; the only name mentioned was "Moonie," Porter's nickname. By contrast, seven witnesses testified that Porter told them he killed Reed and that Telly paid him for it. Considering the extensive witness testimony, there is not "a reasonable probability" that the 10-second rap video clip,

which *implied Porter's involvement* in Reed's and Williams's murders, "contributed to [Telly's] conviction" for Reed's murder. *Ibarra*, 493 F.3d at 532.

### 4. Washington McCaskill Testimony

Telly's next arguments are that the prosecution suppressed evidence beneficial to him in violation of the Sixth Amendment, *see Brady v. Maryland*, 373 U.S. 83 (1963), and that the district court erroneously permitted witness Washington McCaskill to assert his Fifth Amendment privilege against self-incrimination.

On December 14, 2015, McCaskill, who was in prison, met with law enforcement officers and told them that he knew Jackson. McCaskill stated that he purchased heroin from Jackson on several occasions. In May 2016, McCaskill changed his story, telling law enforcement that he lied about purchasing heroin from Jackson and that two fellow inmates, Isaac Skinner and Travis Bradley, had convinced him to lie. But McCaskill stated that the other information that he provided, such as Jackson's involvement in drug dealing, was accurate.

On May 16, 2016, McCaskill wrote two letters outlining this same information to a Louisiana assistant district attorney involved in a related case. McCaskill then testified in state court on May 25 and 26, 2016, about Jackson and the letters that recanted part of his story. The trial in this case began on June 6, 2016. On June 13, 2016, as trial in this case proceeded, the Government learned about McCaskill's letters. The same day, McCaskill's attorney told the Government that while McCaskill was incarcerated, he had a phone call with law enforcement on December 2, 2015. On June 14, 2016, the Government produced McCaskill's letters to defense counsel in this case; a day later, the Government provided the transcript of the phone call.

On June 16, 2016, Telly filed a "Memorandum in Support of Motion for Miscellaneous Relief," contending that the Government violated *Brady* by the tardy delivery of McCaskill's letters and phone transcript. After receiving briefing, the district court disagreed, concluding that the Government's production of the evidence to defense counsel was timely and that, in any event, Telly had not suffered prejudice from the delay. However, because the Government had already called Bradley to testify about his association with McCaskill, the district court permitted defense counsel to recall Bradley for limited cross-examination, given that "the recorded phone conversation may have been useful in impeaching Bradley as to his associations with McCaskill."

A few days later, Jackson called McCaskill to the stand. The parties agreed that McCaskill had partially waived his Fifth Amendment privilege against self-incrimination, to the extent that he admitted in two letters, his state court testimony, and his December 2015 phone call with law enforcement that he had originally lied about purchasing drugs from Jackson and that Bradley and Skinner had encouraged him to lie. However, before McCaskill took the stand, his lawyer advised that he was concerned that if McCaskill was forced to testify, his plea agreement in a separate case might get "cancel[led]," or he might be charged with making a false statement to an agent under 18 U.S.C. § 1001. The district court permitted McCaskill to assert his Fifth Amendment privilege when he was asked about either Bradley or Skinner.

Telly now makes an attenuated argument that McCaskill's assertion of his Fifth Amendment privilege negatively affected Telly's defense. He reasons that because his convictions related to the murder of Darvin Bessie (a Broussard accomplice) were based on Skinner's testimony, he could have used McCaskill's statement that Skinner convinced McCaskill to lie to impeach Skinner's implication of Telly in that murder.

We address Telly's arguments in turn.

### *a. Alleged Brady Violation*

Under *Brady*, the Government "violates a defendant's due process rights if it withholds evidence that is favorable to the accused and material to the defendant's guilt or punishment." *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018). "There are three components to a *Brady* violation. First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the [Government] must have suppressed the evidence. Third, the defendant must have been prejudiced." *Valas*, 822 F.3d at 236–37 (quoting *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000)). "[E]vidence that is turned over to the defense *during* trial . . . has never been considered suppressed." *Swenson*, 894 F.3d at 687. "Instead, . . . when a defendant challenges 'the late production of impeachment evidence,' the analysis 'turns on whether the defendant was prejudiced by the tardy disclosure.'" *Id.* (quoting *United States v. Morrison*, 833 F.3d 491, 508 (5th Cir. 2016)).

"To establish prejudice, . . . [Telly] must show that the evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Valas*, 822 F.3d at 237 (quoting *Hughes*, 230 F.3d at 819). "If the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might have and, indeed, should have been." *United States v. McKinney*, 758 F.2d 1036, 1050 (5th Cir. 1985). *Brady* violations are reviewed de novo. *Valas*, 822 F.3d at 236.

The McCaskill letters and phone transcript were produced mid-trial, on June 14, 2016. Accordingly, the evidence was not suppressed, and the question becomes "whether the defendant was prejudiced by the tardy disclosure." *Swenson*, 894 F.3d at 687 (internal quotation marks omitted).

No. 16-30995

Telly was not. He "received the material in time to put it to effective use at trial." *McKinney*, 758 F.2d at 1050. The Government provided McCaskill's letters to the defense within a day of when the Government learned of them, the letters largely corroborated information that the Government had already provided during discovery (i.e., that McCaskill lied about purchasing drugs from Jackson), and defense counsel was able to use the fact that McCaskill lied during cross-examination of both Bradley and Skinner. Similarly, the belated disclosure of McCaskill's December 2015 phone call did not prejudice Telly because the district court allowed counsel to recall Bradley for limited cross-examination. Moreover, McCaskill's letters, phone transcript, and prior state court testimony were all introduced into evidence for the jury to consider. Telly has failed to establish that the tardy evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Valas*, 822 F.3d at 237 (internal quotation marks omitted). This issue accordingly lacks merit.

### b. McCaskill's Privilege Against Self-Incrimination

Telly also contends that allowing McCaskill to assert his Fifth Amendment privilege against self-incrimination curtailed Telly's right to confront McCaskill. "A defendant has a Sixth Amendment right to compulsory process to obtain favorable testimony . . . . But this right does not always assure a defendant of the testimony sought." *United States v. Goodwin*, 625 F.2d 693, 700 (5th Cir. 1980) (citation omitted). "A valid assertion of the witness'[s] Fifth Amendment rights justifies a refusal to testify despite the defendant's Sixth Amendment rights." *Id.*

"[T]he Fifth Amendment privilege is applicable where the [witness] has 'reasonable cause to apprehend danger from a direct answer.'" *Id.* (quoting *Hoffman v. United States*, 341 U.S. 479, 486 (1951)). "The privilege must be sustained if it is not perfectly clear, from a careful consideration of

all the circumstances in the case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency to incriminate." *Id.* at 701 (quotation marks omitted). "A district court's decision to exclude a witness's testimony based on an invocation of the witness's Fifth Amendment privilege is reviewed for an abuse of discretion." *United States v. Brooks*, 681 F.3d 678, 711 (5th Cir. 2012) (citation and internal quotation marks omitted). "Although the trial court's discretion is not unlimited, it must enjoy wide discretion in resolving a self-incrimination claim." *United States v. Van Deveer*, 577 F.2d 1016, 1017 (5th Cir. 1978) (per curiam).

Telly contends that the district court abused its discretion because McCaskill's testimony would have been "critical to the theory of the defense." Even so, the district court permitted McCaskill to invoke his privilege against self-incrimination partly because McCaskill feared that his plea agreement in a separate case could be canceled due to his testimony in Telly's case. McCaskill was also awaiting sentencing, and "[w]here the sentence has not yet been imposed a defendant may have a legitimate fear of adverse consequences from further testimony." *Mitchell*, 526 U.S. at 326. Because McCaskill's "'answer(s) [could] possibly have [had] such tendency' to incriminate," *Goodwin*, 625 F.3d at 701 (quoting *Hoffman*, 341 U.S. at 488), the district court did not abuse its discretion in permitting McCaskill to assert his Fifth Amendment privilege.

### 5. Telly's Motion for Judgment of Acquittal

Telly's final argument is puzzling: He appears to argue that he was erroneously convicted of 23 overt acts charged in Count 1 (i.e., furthering the RICO conspiracy) because there was no, or very little, evidence to support a finding that Telly committed those acts. At the close of evidence, but before the jury began its deliberations, Telly filed a "Motion for Judgment of Acquittal on Certain Overt Acts." Telly's counsel framed Telly's motion as

one for judgment of acquittal on certain overt acts under Count 1. But at trial, Telly's counsel stated that she "filed [the motion] to strike several of the overt acts in the indictment."

The district court, unclear as to what Telly's counsel sought to do, took the motion under submission. The court later clarified that it was "going to construe [the] motion" as a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. Ultimately, the district court concluded that Telly's motion was "effectively moot" because the court had instructed the jury that the indictment was not evidence, and this court had never "suggest[ed] a defendant can be acquitted of overt acts after the jury returns a verdict." Telly appeals this ruling.

Distilling Telly's argument, he contends that we should strike the challenged overt acts pursuant to *United States v. Luffred*, 911 F.2d 1011 (5th Cir. 1990), because there was insufficient evidence to support that Telly committed them. *Luffred*, however, is inapposite. In *Luffred*, we held that "fair trial requirements mandate[d] that the court parse the indictment and read to the jury only those overt acts covered by the evidence." *Id.* at 1016. But we also acknowledged as settled law "that a court may read an indictment in its entirety provided the jury is instructed that the indictment is not evidence." *Id.* (citing *United States v. Jones*, 587 F.2d 802, 805 (5th Cir. 1979) (per curiam)). Moreover, we limited *Luffred* to "the setting of th[at] particular case." *See id.*

Even if there were insufficient evidence to prove that Telly committed all of the overt acts listed in Count 1, Telly does not offer any authority counter to our precedent that "a court may read an indictment in its entirety provided the jury is instructed that the indictment is not evidence." *Id.*; *see also Kroll v. United States*, 433 F.2d 1282, 1287 (5th Cir. 1970). And here, the record is clear that the district court instructed the jury multiple times to that

effect. Thus, the district court did not err in denying Telly's construed Rule 29 motion on this issue.

## E. PORTER'S COMPETENCY

### 1. Background

The gravamen of Porter's appeal is whether he was competent to stand trial. In 2014, in three separate criminal cases in the Eastern District of Louisiana, Porter contended that he was not. District Judge Sarah Vance presided over two of the cases, and District Judge Martin Feldman presided over the remaining case (charging RICO conspiracy), the case now on appeal. For efficiency, Judges Vance and Feldman decided to conduct Porter's competency proceedings jointly.

The district court held two competency hearings for Porter. During the first, on October 22, 2014, Dr. Shawn Channell and Dr. Bhushan S. Agharkar each concluded that Porter "d[id] not possess sufficient ability to consult with his lawyer" and did not possess a rational "understanding of the proceedings against him."[14] The district court agreed that, at least at that time, Porter was incompetent to stand trial and set a second competency hearing for July 2015. *United States v. Porter*, 907 F.3d 374, 378 (5th Cir. 2018). During the second hearing, Dr. Channell, re-evaluating Porter after seven months of intervening medical treatment, concluded that he was competent to stand trial. Dr. Channell determined that Porter was not in a state of psychosis, which would render him incompetent, but was experiencing "malingering symptoms of psychosis," allowing him to "mediate the inclinations and beliefs that [he had]." Based on Dr.

---

[14] The district court accepted Dr. Channell, a forensic psychologist, and Dr. Agharkar, a forensic psychiatrist, as experts in their respective fields.

Channell's re-evaluation, the district court determined that Porter was competent to stand trial.

Just before the second competency hearing, Porter requested funding for a neuropsychological evaluation. According to an expert hired by Porter, a neuropsychological evaluation was necessary to "understand[] [Porter's] level of [cognitive] functioning." The district court denied Porter's request, reasoning that "Porter fail[ed] to invoke any authority supporting his request for funding . . . at th[at] stage of the proceedings," and that the issue could be addressed at the upcoming competency hearing.

Porter filed a motion to reconsider. He attached scholarly articles detailing the connection between neurocognitive dysfunction and schizophrenia. Porter also attached a letter from Dr. Agharkar explaining why, in his opinion, Porter needed "a full battery of neuropsychological tests" before Dr. Agharkar "could render a full and complete opinion regarding Mr. Porter's competence to stand trial." Lastly, Porter contended that his medical history—replete with alleged physical abuse and mental illness—indicated that he possibly had suffered brain damage and that further testing was necessary on that basis as well.

The district court acknowledged that "Porter ha[d] consistently failed to assist his counsel," possibly indicating impaired brain function, but the court ultimately denied the motion to reconsider. The court noted that Porter did not cite any record evidence supporting his allegations of physical abuse or a family history of mental illness. He also failed to offer any legal authority demonstrating that the court erred in concluding that it was not necessary to appoint a neuropsychologist at that juncture.

During his second competency hearing, Porter re-urged his motion for neuropsychological testing and motion for reconsideration. The district court concluded that "[s]uch testing [was] not necessary in this case and

would be futile." First, the court found that "there [was] ample evidence . . . that Porter [was] acting volitionally and ha[d] engaged in a deliberate course of conduct to convince his evaluators that he ha[d] a mental illness." Second, "the record confirm[ed] that Porter ha[d] the present ability to understand the legal proceedings and assist his counsel." Third, "even if Porter ha[d] brain damage, as Dr. Agharkar suggest[ed] he might, any such finding would not undermine the [c]ourt's finding that Porter function[ed] at a sufficient level to be deemed competent." Fourth, "even if neuropsychological testing were to reveal that Porter ha[d] brain damage, that testing w[ould] not identify how such damage manifest[ed] itself . . . and affect[ed] Porter's competency." "Finally, Porter ha[d] consistently refused to participate in any comprehensive psychological testing" and thus "administration of neuropsychological testing w[ould] be futile."

Porter previously appealed aspects of the district court's competency determination in one of Judge Vance's cases. *See Porter*, 907 F.3d 344. In this appeal, Porter challenges the court's eventual conclusion that he was competent, its denial of his two motions to continue his competency hearing, and Judge Feldman's denial of his request for a neuropsychological evaluation. Porter further argues that these combined rulings stripped him of his constitutional right to expert assistance. Some of these issues were already decided in his prior appeal. Collateral estoppel bars relitigation of those issues, and we find no error in the district court's resolution of the issue not previously appealed.

## 2. Collateral Estoppel

Collateral estoppel "preclude[s] relitigation of the same issue already litigated against the same party in another case involving virtually identical facts." *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 169 (2010). We have already reviewed, and affirmed, the district court's denial of Porter's

two continuance requests and the court's conclusion that Porter was competent to stand trial. *Porter*, 907 F.3d at 380–85. And the parties in this case are the same as those in *Porter*. *Id.* at 377. Thus, collateral estoppel bars Porter from relitigating these issues. *See Stauffer Chem. Co.*, 464 U.S. at 169; *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997).

### 3. Neuropsychological Testing

By contrast, in *Porter*, we determined that we lacked jurisdiction to consider Porter's argument that the district court erred by denying funding for neuropsychological testing. 907 F.3d at 382. We reasoned that Porter's funding request was not filed in the case appealed in *Porter*; it was filed in this case. *Id.* Now properly appealed, we address the issue.

"18 U.S.C. § 3006A(e)[] provides that a 'person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation' may obtain such services after demonstrating in an *ex parte* proceeding that the services are necessary." *United States v. Boyd*, 773 F.3d 637, 642 (5th Cir. 2014). We review the denial of a § 3006A(e) request for abuse of discretion, *id.*, considering the denial "in light of only the information available to the trial court at the time it acted on the motion," *United States v. Gadison*, 8 F.3d 186, 191 (5th Cir. 1993) (quotation omitted).

In denying funding for neuropsychological testing, the district court reasoned that "ample evidence" existed that "Porter [was] acting volitionally and ha[d] engaged in a deliberate course of conduct to convince his evaluators that he ha[d] a mental illness." *Porter*, 907 F.3d at 381–82. The record bears out this conclusion. Before Porter's first competency hearing, he received psychological treatment at the Federal Medical Center at Devens (Devens). While at Devens, Porter refused to speak to medical personnel when they requested that he participate in psychological tests, despite that he was observed "routinely interacting normally" with other

No. 16-30995

individuals.  Because neuropsychological testing would "require[] Porter's full cooperation and effort" to ensure that the results would be reliable and not "show artificially low levels of functioning," and given that Porter willfully refused to cooperate in other psychological testing, we find no abuse of discretion in the district court's denial of Porter's request.[15]

## F. Motions to Sever

Telly, Porter, and Jackson each moved to sever their trials; the district court denied their requests.  On appeal, they contend that the district court abused its discretion in denying their motions.[16]  Telly argues that severance was necessary to ensure a fair trial because Porter's defense "was mutually antagonistic" to his.  Porter argues that denial of severance was unduly prejudicial.  And Jackson contends that the five crimes for which he was indicted were only tangentially related to the other defendants' numerous crimes.

"We review a denial of a motion to sever a trial under the exceedingly deferential abuse of discretion standard." *McClaren*, 13 F.4th at 398 (quoting *United States v. Chapman*, 851 F.3d 363, 379 (5th Cir. 2017)); *see* Fed. R. Crim. P. 14(a) (stating that a court "may order separate trials of counts" to prevent prejudice against a defendant).  "Limiting instructions are generally sufficient to prevent the threat of prejudice." *McClaren*, 13 F.4th at 398 (internal quotation marks and alteration omitted).

---

[15] Porter also contends that "[t]he combined errors of failing to grant [a] neuropsychological evaluation and a continuance stripped [him] of his right to an expert to assist in his defense."  But, as discussed above, Porter has not established any error supporting his contention.  *See Porter*, 907 F.3d at 382–84.

[16] Telly and Porter filed multiple motions to sever.  Neither specifies which denial they appeal, so based on their arguments, we only address their most recent motions.

No. 16-30995

> To demonstrate abuse of discretion, [the] [d]efendants must prove that the joint trial prejudiced them beyond district court protection and that the prejudice outweighed any interest in the economy of judicial administration. Defendants must isolate events at trial, demonstrate the events caused substantial prejudice, and show the jury instructions were inadequate to protect them.

*Id.* (citations omitted).

### 1. Telly's Motion to Sever

At trial, Telly contended that severance was necessary because his defense and Porter's defense were "mutually antagonistic." Specifically, his defense theory was that the alleged murders at issue were committed on Porter's own volition, not at Telly's instruction. The district court denied the motion, but it ordered counsel to restrict cross-examination to questioning witnesses about matters regarding their own clients—e.g., Telly's counsel could not cross-examine witnesses about Porter. And at the conclusion of trial, the district court gave limiting instructions to the jury, including to consider the evidence against each defendant separately and that arguments by counsel were not evidence.

Telly reiterates his argument on appeal. He also contends that the district court's limitation of cross-examination "was an abuse of discretion and . . . led to the significant infringement of [Telly's] right to defend himself at trial."

As a general matter, "persons indicted together should be tried together, especially in conspiracy cases." *United States v. McRae*, 702 F.3d 806, 821 (5th Cir. 2012) (citation and internal quotation marks omitted). "Antagonistic defenses . . . do not result solely when each defendant points the finger at the other." *United States v. Holcomb*, 797 F.2d 1320, 1324 (5th Cir. 1986). Instead, "the defenses must be more than merely antagonistic—

they must be antagonistic to the point of being mutually exclusive." *Id.* (citations and internal quotation marks omitted). Beyond that, "[m]utually antagonistic defenses are not prejudicial *per se.* Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993).

Telly's argument falters out of the gate because Telly's and Porter's defenses were not mutually exclusive. Telly's defense was that he did not order Porter to kill anyone. Porter's defense was that someone else committed the crimes and that the witnesses against him lied. It is possible for a jury simultaneously to believe both. Thus, Telly did not face undue prejudice because of Porter's defense or the district court's denial of severance. *See Holcomb*, 797 F.2d at 1324.

Even assuming prejudice, though, the district court carefully erected guardrails to protect the codefendants' rights in this case. Telly fails to show how these measures were "inadequate to protect [him]." *McClaren*, 13 F.4th at 398 (citations omitted).

As for the district court's limitation on cross-examination of witnesses about other defendants, Telly has not demonstrated "prejudice[] . . . beyond district court protection" because of this restriction. *Id.* Indeed, the relief fashioned by the district court was an effort to *contain* prejudice from "antagonistic" "finger pointing" between codefendants—the very risk that Telly contends mandated severance. *Cf. Holcomb*, 797 F.2d at 1324. Telly asserts that the restriction on cross-examination prevented him from eliciting testimony beneficial to his defense. But he does not "isolate events at trial," e.g., by detailing what testimony he was unable to elicit, or "demonstrate the [court's parameters] caused substantial prejudice." *McClaren*, 13 F.4th at

398. Notably, by the time the district court imposed its limitation, Telly had already fully cross-examined several witnesses.

Further, Telly wholly fails to show that the district court's instructions to the jury were inadequate. *See id.* To the contrary, the district court repeatedly instructed the jury to consider the evidence against each defendant separately. The district court also cautioned the jury that arguments by counsel were not evidence. And the jury acquitted the defendants on some counts, suggesting that "the jury sorted through the evidence and considered each defendant and each count separately." *United States v. Posada-Rios*, 158 F.3d 832, 864 (5th Cir. 1998).

In sum, Telly fails to "prove that . . . the prejudice outweighed any interest in the economy of judicial administration." *Id.* Telly's only mention of judicial economy on appeal is a conclusory assertion that "[c]oncerns of judicial economy—even in such a large and complex case—do not outweigh [a] direct infringement on a defendant's fundamental due process right to present a complete defense." But Telly nowhere explains why a joint trial was not preferrable, especially considering that "persons indicted together should be tried together, especially in conspiracy cases." *McRae*, 702 F.3d at 821 (citation and internal quotation marks omitted); *see also Zafiro*, 506 U.S. at 537. As the district court stated, "so much [in this case] is intertwined," and "severance would [have] require[d] months of separate mini trials." Without more, we discern no abuse of discretion as to this issue.

### 2. Porter's Motion to Sever

Porter contends that the district court erred in denying severance because (1) "Porter was prejudiced from the spillover effect of being tried alongside his codefendants accused of participating in a massive drug distribution conspiracy that spanned at least fifteen years," and (2) "Porter's

No. 16-30995

codefendants all used a mutually antagonistic trial strategy that painted him as the most culpable to the jury."[17]

Porter primarily points to witness testimony describing Telly's and Jackson's involvement in the RICO conspiracy as evidence that he contends would not have been admissible at his solo trial. But "the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978). The purpose of trying RICO co-conspirators together is to catch all the "fish" together in one "RICO net," even if not every piece of evidence is directly attributable to each individual co-conspirator. *Id.*

Regardless, even assuming Porter was prejudiced by "spillover" evidence, that alone would "not ordinarily warrant severance." *McRae*, 702 F.3d at 827. Porter must explain how "the district court was unable to afford protection against the prejudice," and he fails to do so. *Id.* He contends that he "had nothing to do" with the drug distribution conspiracy, and the "weeks of testimony and evidence the [G]overnment presented in connection to Porter's codefendants . . . overwhelmed the jury's ability to adjudicate his guilt or innocence." But the record does not support Porter's contention. Porter's role in the RICO conspiracy was clear: He was a hitman for Telly and joined the Hankton Enterprise in 2009.[18] There is nothing in the record indicating that the jury confused Porter's role. Porter also

---

[17] Porter also attempts to adopt Jackson's severance argument. However, "under Rule 28(i), severance issues are fact-specific" and thus cannot be adopted by co-defendants. *Solis*, 299 F.3d at 441 n.46.

[18] Porter points to the Government's closing statement to argue that he was erroneously implicated in the killing of Venice Brazley in 2000. But the record does not indicate that the jury believed Porter was involved in the Hankton Enterprise until 2009, well after Brazley was killed. And considering the entirety of the closing statement, the Government explicitly argued that *Telly* was the one who killed Brazley, not Porter.

concedes that the district court gave a limiting instruction to the jury but contends that the six-sentence instruction "could not have possibly cured the extraordinary prejudice Porter experienced." Without more than that conclusory statement, though, Porter has not shown that the trial court's instruction failed to protect him from undue prejudice. *See McClaren*, 13 F.4th at 398.

Porter's antagonistic defense argument fails for the same reason as Telly's. Porter primarily relies on *United States v. Green*, 324 F. Supp. 2d 311 (D. Mass. 2004), to frame his argument that Telly was deflecting blame to him for the alleged murders at issue. However, Porter has not demonstrated that the codefendants' strategies were "mutually exclusive," as required in this circuit. *See Holcomb*, 797 F.2d at 1324. The district court did not abuse its discretion in denying Porter's severance motion.

### 3. Jackson's Motion to Sever

Jackson contends that his involvement in the alleged conspiracy was so short-lived that he was substantially prejudiced as a result of being tried alongside his alleged co-conspirators. This argument fails for the same reason as Porter's argument regarding spillover prejudice. And it is belied by the fact that the jury acquitted Jackson of killing Jesse Reed. He was also acquitted of other charges. Jackson argues that despite the acquittals, he was likely convicted of RICO conspiracy simply because the jury was "overwhelmed" by evidence attributable to his codefendants. But he points to nothing in the record to support this conclusory statement. Thus, Jackson has not "prove[n] that the joint trial prejudiced [him] beyond district court protection." *See McClaren*, 13 F.4th at 398.

### G. Leak of Grand Jury Information

There were three superseding indictments in this case. Five days before the second superseding indictment was returned by the grand jury, the

Times-Picayune newspaper published confidential grand jury information in an article discussing the defendants' charges.[19]  The Government conceded that the article was present in the grand jury room during deliberations regarding the second superseding indictment.  Telly, Andre, Porter, and Jackson moved for sanctions, to dismiss the indictment, and for an evidentiary hearing into a possible violation of Federal Rule of Criminal Procedure 6(e)(2).[20]  The district court granted their request for an evidentiary hearing, which was held in May 2014.[21]  On June 19, 2014, a different grand jury charged Telly, Andre, Jackson, Porter, and nine others in the operative 24-count third superseding indictment.

On appeal, Porter contends that the district court erred by refusing to allow the defendants to question the reporters regarding the potential violation of Rule 6(e)(2).  Porter frames the issue as a violation of his constitutional rights, necessitating de novo review.  However, Porter's argument is primarily that the district court should have expanded the scope of the evidentiary hearing to allow additional questions about the alleged leak and its potential effect on the grand jury's deliberations.  We review the district court's rulings regarding the scope of the hearing for an abuse of

---

[19] The Government later conceded that FBI agents leaked the confidential information to the Times-Picayune.

[20] Rule 6(e)(2)(B) prohibits disclosure of "a matter occurring before the grand jury" by a grand juror, interpreter, court reporter, operator of a recording device, person who transcribes recorded testimony, attorney for the government, or a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii).

[21] Although the Government conceded that FBI agents disclosed confidential information, the district court held that the defendants did not meet their burden of demonstrating prejudice from the disclosure. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988) ("[A] district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.").  The district court therefore denied the defendants' motions for sanctions and to dismiss.

discretion. *See United States v. Haese*, 162 F.3d 359, 365 (5th Cir. 1998); *see also United States v. Skulsky*, 786 F.2d 558, 562 (3d Cir. 1986) (applying abuse of discretion standard of review when considering whether district court erred "in limiting the scope of [an] evidentiary hearing").

In *United States v. Smith*, the defendant challenged his original indictment by alleging that it was based on prosecutorial misconduct. 697 F. App'x 836, 837 (5th Cir. 2017) (per curiam). However, the original indictment was dismissed after a superseding indictment was issued. *Id.* Because the defendant was tried on the superseding indictment, we held that his challenge to the original indictment was moot. *Id.*; *cf. United States v. Lee*, 622 F.2d 787, 789 (5th Cir. 1980) (holding that filing of a second superseding indictment did not moot appeal from the dismissal of the first superseding indictment when earlier indictment remained pending).

So too here. Porter's entire argument pertains to the second superseding indictment. But a *different* grand jury issued the third superseding indictment, about two years after the second. Porter concedes that the second superseding indictment was dismissed. He attempts to salvage his argument by contending that its dismissal did not cure the error because the third superseding indictment incorporated the same error. Porter points to no legal authority or record evidence to support that contention. We thus find this issue moot.[22]

## H. Rule of Unanimity

Jackson asserts that the district court erred when it failed to instruct the jury that it had to find Jackson guilty of Reed's murder (Count 10), either as a principal or accomplice, by unanimous vote. Porter and Telly adopt

---

[22] Even if not moot, Porter's argument is inadequately briefed and fails for that reason as well. *See Rutherford*, 197 F.3d at 193; *see also Sineneng-Smith*, 140 S. Ct. at 1579.

No. 16-30995

Jackson's argument, and Andre makes a similar argument regarding the count charged against him (Count 8).[23]  Count 10 charged Jackson, Porter, and Telly with violating 18 U.S.C. §§ 1959(a)(1) and 2.  Section 1959(a)(1) criminalizes violent crimes in aid of racketeering activity.  Section 2 is the general aiding and abetting provision.  Jackson contends that because these two crimes were both listed under Count 10, "there is no way to determine whether the jury's verdict . . . was unanimous," thus violating the rule of unanimity.

Because this issue "was not raised before the jury was charged," we review for plain error.  *See Puckett v. United States*, 556 U.S. 129, 134 (2009).  But there is no error, plain or otherwise.  We do not require a jury to "make an independent determination of whether the defendant committed the [charged] offense as a principal or as an aider and abettor.  Both are sufficient for conviction; both are treated the same for punishment."  *United States v. Williams*, 449 F.3d 635, 648 (5th Cir. 2006).  Jackson's unanimity argument therefore fails, as do Porter's and Telly's.

Andre and Telly contend that the aiding and abetting instruction as to Count 8 was deficient for two additional reasons: (1) it did not include "the necessary elements of knowledge and intent," and (2) it "failed to make clear that the jury was required to find that Andre 'actively participated' in the predicate RICO conspiracy or drug trafficking conspiracy."  However, because we vacate Andre's and Telly's convictions under Count 8 for the reasons discussed *supra* in Part II, we need not address these issues further.

---

[23] Porter and Telly seek to adopt Jackson's argument, though Porter expands it to encompass both Count 10 and Counts 12, 15, and 17.  The Government does not contend that the argument is "fact-specific," such that it cannot be adopted by Jackson's co-defendants.  *See Solis*, 299 F.3d at 434 n.3; *Alix*, 86 F.3d at 434 n.2.  We therefore permit Porter and Telly to adopt this argument.

No. 16-30995

## I. Sufficiency of the Evidence

Jackson next challenges the sufficiency of the evidence supporting his convictions for RICO conspiracy (Count 1) and the VICAR murder of Reed (Count 10).[24]  "To prove a RICO conspiracy, the government must prove only that the defendants conspired to violate 18 U.S.C. § 1962(c)." *McClaren*, 13 F.4th at 400 (citing *United States v. Nieto*, 721 F.3d 357, 368 (5th Cir. 2013)).  "Section 1962(c) states that it shall be unlawful for any person associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  *Id.* (internal quotation marks and alterations omitted).  "'Racketeering activity' includes state felony offenses involving murder, robbery, extortion, and several . . . serious federal offenses including extortion and narcotics violations."  *Id.* (citing 18 U.S.C. § 1961(1)).  "The nexus with interstate commerce required by RICO is minimal."  *Id.* at 402 (quotation omitted).  "The elements of [a] conspiracy 'may be established by circumstantial evidence and may be inferred from the development and collocation of circumstances.'"  *United States v. Mendoza*, 226 F.3d 340, 343 (5th Cir. 2000) (quoting *United States v. Gonzalez*, 79 F.3d 413, 423 (5th Cir. 1996)).

---

[24] In part, Jackson asserts that, as to both the RICO conspiracy and Reed's murder, if "the evidence . . . gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, [the court] must reverse the conviction, as under these circumstances a reasonable jury must necessarily entertain a reasonable doubt."  (Quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996) (internal quotation marks omitted)). But this "equipoise rule" no longer governs in this circuit.  *See United States v. Spalding*, 894 F.3d 173, 181 n.11 (5th Cir. 2018) (citing *United States v. Vargas-Ocampo*, 747 F.3d 299, 301–02 (5th Cir. 2014) (en banc)).

Jackson does not challenge that there was an agreement, drug-dealing that affected interstate commerce, or a pattern of racketeering activity. He just argues that the evidence that *he* was involved in the RICO conspiracy was insufficient. But at trial there was testimony from an alleged drug dealer, Travis Bradley, that Bradley purchased drugs from Telly, Telly told Bradley that he could start "dealing with his people," and Bradley subsequently met and dealt with Jackson, purchasing drugs from Jackson "seven, maybe eight times." This is sufficient to tie Jackson to the charged RICO conspiracy. *See McClaren*, 13 F.4th at 400.

Jackson counters that Bradley's testimony was unreliable because Bradley was mistaken about when he purchased cocaine from Jackson, and Bradley had ulterior motives in testifying against Jackson. But Jackson's assertion that Bradley lacked credibility, in itself, fails to show that no rational juror could find that Jackson participated in the RICO conspiracy, particularly when construing the evidence in the light most favorable to the verdict. *See McClaren*, 13 F.4th at 402 ("Once the [G]overnment presents evidence of a conspiracy, it only needs to produce slight evidence to connect an individual to the conspiracy." (quoting *United States v. Virgen-Moreno*, 265 F.3d 276, 285 (5th Cir. 2001))); *see also United States v. Kieffer*, 991 F.3d 630, 634 (5th Cir. 2021) ("[T]he jury decides credibility of witnesses, not the appellate court.").

Jackson also challenges his VICAR conviction springing from Reed's murder. *See* 18 U.S.C. § 1959(a)(1), (2). He contends that the phone records indicating he called Porter 239 times leading up to Reed's murder are "insufficient to sustain [his] conviction," and that the testimony of two witnesses against Jackson was unreliable to establish that he "was aware of and somehow supported the efforts" of Telly and Porter to murder Reed.

"VICAR states that whoever for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity murders or assaults with a dangerous weapon any individual in violation of the laws of any State or the United States shall be punished." *McClaren*, 13 F.4th at 403 (citing 18 U.S.C. § 1959(a)) (internal quotation marks and alterations omitted). "The government must prove the following four elements: (1) that a criminal organization exists; (2) that this organization is a racketeering enterprise; (3) that the defendant committed a violent crime; and (4) that the defendant acted for the purpose of promoting his position in a racketeering enterprise." *Id.* (citation omitted). Anyone who "aids, abets, counsels, commands, induces or procures [the] commission [of such an offense] is punishable as a principal." 18 U.S.C. § 2.

There is ample evidence to support Jackson's VICAR conviction. For instance, an acquaintance of Telly's and Porter's testified that he heard that Telly wanted to kill Reed, so the acquaintance introduced Porter and Telly. An FBI agent testified that Jackson contacted Porter in June 2009, shortly before Reed's murder. The phone records establish that in the weeks leading up to Reed's murder, Jackson and Porter talked on the phone 239 times. The day Reed was murdered, Jackson and Porter contacted each other 27 times. Porter's and Jackson's cell phones also indicated that they were near Reed's house the night that he was murdered. Another witness testified that Porter told him about two months after Reed's murder that Porter, Telly, and "Telly's cousin" (i.e., Jackson) killed Reed. And Porter's girlfriend testified that she overheard Porter and Jackson discussing the crime and that Jackson paid Porter $20,000 for the hit. Considering the evidence in the light most favorable to the verdict, we conclude that a reasonable juror could find that Jackson (at least) "was aware of and supported" Reed's murder. *See McClaren*, 13 F.4th at 400. While Jackson contends that the witnesses

against him were unreliable, that contention fails for the same reason as discussed *supra*. *See Kieffer*, 991 F.3d at 634.

## J. Cumulative Error

Jackson's, Porter's, and Andre's final argument is that their convictions must be reversed because of cumulative error. "The cumulative error doctrine provides that an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Oti*, 872 F.3d 678, 690 n.10 (5th Cir. 2017) (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998)) (internal quotation marks omitted). "Cumulative error justifies reversal only when errors so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* (quotation omitted).

The defendants have not established "an aggregation of non-reversible errors" warranting reversal. *Id.* To the contrary, we have found no errors, other than as related to their § 924 convictions and restitution. Thus, the defendants' argument that cumulative error requires reversal of their convictions lacks merit. *See United States v. Gibson*, 875 F.3d 179, 199 (5th Cir. 2017).

## III. Conclusion

Because the jury may have improperly relied on the charged RICO conspiracy as a predicate for the defendants' § 924 convictions, we VACATE Telly's, Andre's, and Porter's convictions under Counts 3, 6, 8, 11, 13, 16, and 18 and REMAND for further proceedings consistent with this opinion. For similar reasons, we likewise VACATE Telly's, Andre's, and Porter's restitution orders and REMAND. Otherwise, the district court's judgment is AFFIRMED.

AFFIRMED in part; VACATED in part; REMANDED.

James L. Dennis, *Circuit Judge*, concurring in part, dissenting in part:

I concur in most of my colleague's thorough majority opinion, but I respectfully dissent as to the sufficiency of the evidence to support Andre Hankton's convictions in Counts 3 and 8 for violations of 18 U.S.C. §§ 924(j) and (o). Because the Government failed to present sufficient evidence that Andre intended to further a drug trafficking offense, I would reverse, rather than vacate, Andre's convictions under Counts 3 and 8. *See United States v. Miller*, 952 F.2d 866, 871 (5th Cir. 1992).

"When an insufficiency-of-the-evidence claim of error is properly preserved through a motion for judgment of acquittal at trial, it is reviewed *de novo*." *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007) (quoting *United States v. Ragsdale*, 426 F.3d 765, 770 (5th Cir. 2005)). "[W]e will affirm . . . if a reasonable trier of fact could conclude . . . the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict." *Id.* (alterations in original) (quoting *Ragsdale*, 426 F.3d at 770-71). However, "to demonstrate sufficiency, the Government 'must do more than pile inference upon inference.'" *Id.* at 314 (quoting *United States v. Maseratti*, 1 F.3d 330, 337 (5th Cir. 1993)).

Sections 924(j) and (o) each require application of 18 U.S.C. § 924(c). Section 924(j) provides a greater penalty for violations of § 924(c) that cause a death by firearm, and § 924(o) prohibits conspiracy to violate § 924(c). Section 924(c), in turn, prohibits using or carrying a firearm during and in relation to a crime of violence or drug-trafficking crime, as well as possession of a firearm in furtherance of a crime of violence or drug-trafficking crime. The specific crime of violence and drug trafficking crime connected to Counts 3 and 8 were, respectively, RICO conspiracy as charged in Count 1

and conspiracy to distribute cocaine base, cocaine hydrochloride, heroin, and marijuana, as charged in Count 2. Because, as the majority recognizes, RICO conspiracy does not qualify as a crime of violence, the only predicate crime Counts 3 and 8 may rest on is the drug distribution conspiracy. *See United States v. Jones*, 935 F.3d 266, 271 (5th Cir. 2019).

To show that the use of firearms was "during and in relation to" a drug trafficking crime under § 924(c), "the firearm must have some purpose or effect with respect to the drug trafficking crime." *United States v. Smith*, 481 F.3d 259, 264 (5th Cir. 2007) (quoting *Smith v. United States*, 508 U.S. 223, 238 (1993)). There must be evidence that the defendant "used the weapon to protect or facilitate [a] drug operation, and that the weapons were in some way connected to the drug trafficking." *United States v. Baptiste*, 264 F.3d 578, 588 (5th Cir. 2001), *modified in other respects by United States v. Baptiste*, 309 F.3d 274 (5th Cir. 2002). In order to show that possession of a firearm was "in furtherance of" a drug trafficking crime under § 924(c), the government must prove that the defendant possessed a firearm that "furthers, advances, or helps forward the drug trafficking offense." *United Stated v. Ceballos-Torres*, 218 F.3d 409, 415 (5th Cir. 2000).

Count 3 charged Andre with conspiring to use and carry firearms during and in relation to a crime of violence and a drug trafficking crime and to possess firearms in furtherance of a crime of violence and a drug trafficking crime, in violation of § 924(o). In order to prove conspiracy under § 924(o), the Government must prove Andre "agreed to violate 18 U.S.C. § 924(c), knew of the agreement's unlawful purpose, and joined in it willfully with the intent to further that purpose." *United States v. McClaren*, 13 F.4th 386, 414 (5th Cir. 2021). "The government must prove the same degree of criminal intent as is necessary for proof of the underlying substantive offense." *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir. 2001).

Count 8 charged Andre with aiding and abetting Telly Hankton in using and carrying a firearm during and in relation to a crime of violence and drug trafficking crime and in the course thereof causing the death of Darnell Stewart through use of a firearm, in violation of § 924(j) and 18 U.S.C. § 2. "[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014); *see United States v. Smith*, 609 F. App'x 180, 188 (5th Cir. 2015). "[F]or purposes of aiding and abetting law, a person who actively participates in a criminal scheme knowing its extent and character intends that scheme's commission." *Rosemond*, 572 U.S. at 77. Specifically regarding § 924(c), "the intent must go to the specific and entire crime charged—so here, to the full scope (*predicate crime* [*i.e.*, drug trafficking] plus gun use) of § 924(c)." *Id.* at 76 (emphasis added).

With these principles in mind, the evidence offered by the Government fails to show Andre participated in Stewart's murder with the knowledge and intent to further the Hankton drug operation. Indeed, the testimony cited in the Government's brief on the sufficiency issue does not mention Andre by name *at all*. Instead, the Government relies on (a) hearsay testimony from a witness to a different murder (committed by Porter) that unnamed people told the witness that "the Hankton family is the biggest crime family in New Orleans"; (b) testimony from another drug dealer, Michael Anderson, as to drug activity by *other* members of the Hankton family, but not by Andre; (c) testimony from Stewart's sister about various shootings and murders, with no mention of drug activity on the part of Andre; and (d) testimony from a police officer about a different shooting than the one Andre was involved in, again, with no mention of drug activity by Andre.

On the other hand, two witnesses testified that Andre was not involved in drug dealing; that he worked in the merchant marine and was

absent from New Orleans for periods of time when he was on ships at sea for work; and that he was motivated to participate in Stewart's murder by a desire for revenge because Stewart was involved in his brother George's murder. This testimony was unrebutted.

All that the Government's evidence shows is that some of Andre's family was involved in drug operations, but "everyone knows that guilt of a conspiracy cannot be proven solely by family relationship or other type of close association." *United States v. Ritz*, 548 F.2d 510, 522 (5th Cir. 1977) (citing *Causey v. United States*, 352 F.2d 203 (5th Cir. 1965); *United States v. Tyler*, 505 F.2d 1329 (5th Cir. 1975); *United States v. Martinez*, 486 F.2d 15 (5th Cir. 1973)); *cf. United States v. Gonzales-Perales*, 313 F. App'x 677, 684 (5th Cir. 2008) ("Our precedent is well settled that the Government may "not attempt to prove a defendant's guilt by showing that she associates with 'unsavory characters.'" (quoting *United States v. Polasek*, 162 F.3d 878, 884 (5th Cir. 1998))). Of course, it is possible that Andre could have had dual motives to avenge George and further the Hankton drug operation. "But possibilities, however numerous, do not supply proof," and at trial there was only evidence of the personal revenge motive. *See Martinez*, 486 F.2d at 24.

The Government's evidence as to the actions of Andre's relatives and their associates does not show that Andre had the knowledge and intent to further the Hankton drug operation, *see McClaren*, 13 F.4th at 414, or that he knew the full "extent and character" of the plan to murder Stewart, including the predicate drug distribution conspiracy, *see Rosemond*, 572 U.S. at 76-77. To find such intent, one must "pile inference upon inference." *McDowell*, 498 F.3d at 312 (quoting *Maseratti*, 1 F.3d at 337). In my view, the Government has not met its burden as to Andre's convictions under Counts 3 and 8, and I would accordingly reverse his convictions under those counts.

I respectfully dissent.